|  |  |  |
|---|---|---|
| | ) | |
| **HENRY LOUIS WALLACE,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| **MARVIN POLK, Warden,** | ) | |
| **Central Prison** | ) | |
| **Raleigh, North Carolina,** | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**THIS MATTER** is before the Court upon Henry Louis Wallace's Petition for Writ of

Habeas Corpus, filed pursuant to 28 U.S.C. § 2254 on November 8, 2005. Also before the Court are

the State's[1] Motion for Summary Judgment, as well as Wallace's Cross-Motion for Summary

Judgment.

## FACTS

On April 4, 1994, Wallace was indicted for the murders of (1) Caroline Love, (2) Shawna

Hawk, (3) Audrey Ann Spain, (4) Valencia M. Jumper, (5) Michelle Stinson, (6) Vanessa Little

Mack, (7) Betty Jean Baucom, (8) Brandi June Henderson, and (9) Deborah Slaughter. In addition,

Wallace was indicted for the following crimes: (1) first-degree rape of Love, (2) second-degree rape

of Hawk, (3) two counts of second-degree sexual offense against Hawk, (4) first-degree rape of

Spain, (5) robbery with a dangerous weapon of Spain, (6) first-degree rape of Jumper, (7) first-degree

sexual offense against Jumper, (8) first-degree rape of Stinson, (9) first-degree sexual offense against

---

[1] For ease of reference, the Court will refer to Respondent as "the State" throughout this Order.

Stinson, (10) first-degree rape of Mack, (11) robbery with a dangerous weapon of Mack, (12) first-degree rape of Baucom, (13) robbery with a dangerous weapon of Baucom, (14) first-degree rape of Henderson, (15) robbery with a dangerous weapon of Henderson, (16) assault with a deadly weapon inflicting serious injury against T.W., Henderson's ten-month-old son, (17) assault on a child under twelve years of age against T.W., (18) first-degree rape of Slaughter, and (19) robbery with a dangerous weapon of Slaughter.

Wallace was tried in a capital proceeding before a jury in the Superior Court of Mecklenburg County. Wallace was represented by Isabel Day and James Cooney. The State was represented by Marsha Goodenow and Anne Tompkins. At his trial, the State presented evidence that Wallace murdered nine women in the Charlotte area over a two-year period. The State introduced redacted versions of defendant's tape-recorded confession to police. The following facts are summarized from the North Carolina Supreme Court's opinion on Wallace's direct appeal. See State v. Wallace, 528 S.E.2d 326, 488-503 (N.C. 2000).

*Caroline Love Murder*

Caroline Love was the roommate of Sadie McKnight, Wallace's girlfriend. On the night of June 15, 1992, Love worked a shift at a Bojangles restaurant on Central Avenue. When she finished her shift, she bought a $10 roll of quarters from the night manager to do her laundry. As she walked to her apartment, her cousin, Robert Ross, saw her, picked her up, and took her to her apartment. After Love failed to report for work for several days, Love's employer notified her sister, Kathy, about her absence. Kathy, McKnight, and Wallace went to the police station and filed a missing person's report. During the investigation of the missing person report, Investigator Tony Rice of the Charlotte-Mecklenburg Police Department ("CMPD") determined that the $10 roll of quarters was

missing from her apartment. Love was not found as a result of the missing person report.

On March 13, 1994, Wallace confessed to the murder of Caroline Love. In the confession, Wallace stated that he made a copy of McKnight's house key and went to the apartment when McKnight and Love were not there. When he heard Love enter the apartment, he indicated that he was in the bathroom and would leave as soon as he came out. Upon coming out of the bathroom, however, Wallace went into the living room where Love was watching television and kissed her on the cheek. Love promised not to tell McKnight about the kiss if Wallace promised not to do it again. Wallace then put his arms around Love in a manner similar to a wrestling choke hold. There was a scuffle and Love scratched him on his arms and face. Wallace maintained his hold on Love until she passed out. Wallace then moved Love to her bedroom, removed her clothes, tied her hands behind her back with the cord of a curling iron, and placed tape over her mouth. Wallace had oral sex and sexual intercourse with Love, during which she was semiconscious. While engaged in intercourse with Love, Wallace continued to apply the choke hold because Love began to regain consciousness. Afterwards, Wallace strangled Love to death.

Wallace further confessed that he wrapped Love's body in a bed sheet and put the body inside a large orange trash bag. He placed some clothing into another bag to make it appear that Love had left. He also admitted taking a roll of quarters from Love's dresser. Wallace dumped the trash bag containing Love's body in some woods. The next day, Wallace returned to that location and removed Love's body from the trash bag because he feared that the orange bag would be visible from the road. He dumped Love's body in a ravine. After his confession on March 13, 1994, Wallace directed Rice and other investigators to the site where he had dumped Love's body. See id. at 331-32.

*Shawna Hawk Murder*

In February 1993, Shawna Hawk was living in Charlotte with her mother, Sylvia Denise "Dee" Sumpter. On February 19, 1993, Sumpter arrived home and began to cook dinner. Hawk's car was not there, but Sumpter saw Hawk's coat and purse in a closet. After learning that Hawk failed to pick up her godson from daycare, Sumpter called police to file a missing persons report. While waiting for police, Hawk's boyfriend, Darryl Kirkpatrick, searched the house and found Hawk's body submerged in water in a bathtub. She was pronounced dead at the hospital.

On February 20, 1993, Dr. James Sullivan, a forensic pathologist and medical examiner employed by the Medical Examiner's Office of Mecklenburg County, performed an autopsy on Hawk's body. Dr. Sullivan observed hemorrhages in the lining of the eyes (conjunctiva), on the skin of the face, in the lining of the mouth, and in the muscles in the front of the neck overlying the voice-box area, all of which were an indication of ligature strangulation. Dr. Sullivan defined a ligature as "an instrument, a cord or a band or something that's made into a cord or a band, then circles the neck and is used to forcibly compress the neck." Id. at 333. Thus, Dr. Sullivan opined that the cause of Hawk's death was ligature strangulation.

Wallace confessed that he stopped by Hawk's home to see her. Hawk worked at a Taco Bell restaurant on Sharon Amity Road, where Wallace was her manager. Wallace confessed to raping and engaging in oral sex with Hawk. Wallace admitted that Hawk was afraid and cried the whole time. Afterwards, Wallace forced Hawk to re-dress and then took her into the bathroom. He placed Hawk in a choke hold, with her head between his arms, until she passed out. Wallace then filled the bathtub with water and placed Hawk in it. Wallace also admitted taking fifty dollars from Hawk. See id. at 332-33.

*Audrey Spain Murder*

In June 1993, Audrey Spain, age twenty-four, lived in an apartment in Charlotte and worked at a Taco Bell restaurant on Wendover Road. After Spain failed to report to work on June 23 and 24, 1993, and after phone messages left for her went unreturned, Spain's manager at Taco Bell called 911. Thereafter, uniformed officers periodically rode by the apartment and knocked on the door, but did not get a response. On June 25, 1993, maintenance personnel from the apartment complex entered the apartment through a sliding glass door and discovered Spain's body on the bed.

On June 26, 1993, Dr. Sullivan conducted an autopsy on Spain's body. There was a ligature made from a T-shirt and a bra around Spain's neck with the end of the T-shirt stuffed into her mouth. Dr. Sullivan observed hemorrhages in the conjunctiva, on the skin of the face, in the voice box, and in the muscles in the front of the neck, as well as minor blunt-trauma injuries on her face, back, knee and hip. Dr. Sullivan opined that the cause of death was strangulation.

Wallace confessed that he went to Spain's house and that they smoked marijuana together. Wallace admitted that his motive for visiting Spain was robbery. He stated that he put Spain in a choke hold in her living room and inquired about the combination for the safe at her workplace, but she said she did not know the combination. Wallace also asked about money in her personal bank account. Spain begged Wallace not to hurt her, but he maintained the choke hold until she passed out. Wallace then dragged Spain into her bedroom and raped her. Afterwards, Wallace took Spain into the bathroom, where he put her into the shower to wash off any evidence. Wallace placed Spain on her bed and tied a T-shirt and bra around her neck. Before leaving, Wallace took Spain's keys and Visa credit card. He used the Visa card to purchase gas. Wallace returned to Spain's apartment to make phone calls so it would seem as though she had not died on the day that he had killed her.

See id. at 333-34.

*Valencia Jumper Murder*

In August 1993, Valencia Jumper was a senior at Johnson C. Smith University in Charlotte, studying political science. She also worked at Food Lion on Central Avenue and at Hecht's in South Park Mall. On August 9, 1993, Jumper's friend, Zachery Douglas, spoke with her on the phone about meeting later that night. When Douglas arrived at Jumper's apartment in the early morning hours of August 10, 1993, he noticed smoke coming from her apartment. After entering the unlocked apartment door and seeing too much smoke to enter, Douglas alerted a neighbor, who called the fire department.

Firefighter Dennis Arney entered the kitchen and noticed that a burner on the stove had been left on. Based on examinations at the fire scene, the information provided by firefighters, and the observed pattern the fire traveled, the investigators determined the fire originated from a pot left burning on the stove. Firefighters found Jumper's charred body in the bedroom of her apartment.

Wallace confessed to murdering Jumper. He indicated that Jumper was like a little sister to him and that they often spent time with one another. Wallace stated that he stopped by Jumper's apartment and that they talked for a while before he left. He later returned to Jumper's apartment and asked her to call McKnight because they had gotten into a fight. When Jumper reached toward the phone, Wallace put her in a choke hold. Wallace confessed to raping and engaging in oral sex with Jumper. Afterwards, Wallace put a towel around her neck and choked her until she passed out. He stated that Jumper started bleeding from the nose, so he kept the pressure on the towel for about five minutes until he felt no pulse. He then wiped his fingerprints from certain areas of the apartment. Wallace also went into the kitchen, noticed a bottle of rum, returned to the bedroom, and

poured the rum on Jumper's body, on the bed, and on the floor nearby. Wallace went back into the kitchen, opened a can of beans, put the beans in a pot on the stove, and turned the stove on high. He took the battery out of the smoke detector and went into the bedroom, lit a match, and threw it on Jumper's rum-soaked body before leaving the apartment. Wallace returned to the apartment twenty minutes later. When he saw smoke rushing out the door, he left and went home. Wallace also admitted taking jewelry from Jumper's body and pawning it at a local pawn shop. See id. at 334-35.

*Michelle Stinson Murder*

In September 1993, Michelle Stinson, age twenty, lived in an apartment in Charlotte with her two young sons. On September 15, 1993, Stinson's friend, James Mayes, stopped by her apartment. Mayes knocked on the front door, but no one answered. Mayes heard the children knocking on the window and telling him their mother was sleeping on the kitchen floor. The oldest child came out the back door. Mayes picked up the child and went into the apartment. Mayes discovered Stinson lying on the kitchen floor with blood around her. Mayes picked up the phone but realized that the cord had been cut or jerked out of the wall. Mayes took the children to a neighbor's apartment and called the police.

Dr. Sullivan performed an autopsy on Stinson's body on September 16, 1993. He discovered four stab wounds to the left side of the back. Two of the four stab wounds caused injury to the heart and lungs and were potentially fatal. Dr. Sullivan also observed evidence of ligature strangulation in the form of a band of abrasions and contusions over the front of the neck and small hemorrhages in the skin of the face, the conjunctiva, and internally in the muscles of Stinson's neck. Dr. Sullivan opined that the cause of Stinson's death was stab wounds to the chest with strangulation as a contributing cause.

Wallace confessed that he stopped by Stinson's apartment around 11:00 p.m., with the intention of raping and murdering her. They talked for a while, and then defendant got ready to leave, and they hugged. At that point, Wallace told Stinson that he wanted to have sex with her and that he wanted her to remove her clothes. Wallace choked Stinson until she agreed to have sex with him. According to Wallace's confession, Stinson performed oral sex on him and the two engaged in sexual intercourse on the kitchen floor. Afterward, Wallace put Stinson in a choke hold until she passed out and then he strangled her with a towel. When Stinson began to gasp for air, Wallace took a knife and stabbed her approximately four times. He used a washcloth to wipe his fingerprints from a glass, the door, the phone, the wall, and the floor. Wallace left through the back door, using a towel to avoid leaving fingerprints, and threw the knife and washcloth over a fence near the back of Stinson's apartment. See id. at 335.

*Vanessa Mack Murder*

In February 1994, Vanessa Mack lived in an apartment in Charlotte with her two young daughters and worked at Carolinas Medical Center. On February 20, 1994, Barbara Rippy, the grandmother of Mack's oldest daughter, went to Mack's apartment to pick up her youngest daughter, as she did every Sunday morning so that Mack could go to work. Rippy arrived at 6:00 a.m. and went to the back door, which was ajar. As she entered, Rippy noticed Mack's four-month-old daughter lying on the couch. Rippy entered the bedroom and saw Mack's feet hanging off the side of the bed. Rippy testified that Mack's feet were the only part of her body exposed and that they appeared gray and felt cold. Rippy called 911.

Officer Jeffrey Bumgarner of CMPD found Mack lying on her bed. Bumgarner observed a towel around Mack's neck and blood coming from her nose, ears, and the back of her head.

Bumgarner also noticed a pocketbook, with its contents scattered on the bed.

Dr. Sullivan performed an autopsy on Mack's body on February 21, 1994. He observed minimal evidence of blunt trauma as well as evidence of strangulation. There was a ligature in place around Mack's neck consisting of a long-sleeve pull-over type shirt and a towel. Dr. Sullivan also observed small hemorrhages in the conjunctiva, on the skin of the face, and in the muscles in the front of the neck. He also observed small areas of bruising beneath the ligature likely caused by the pinching of the ligature. Dr. Sullivan opined that the cause of Mack's death was strangulation.

Wallace confessed to murdering Mack and admitted that his motives for going to see Mack, who was a friend, were robbery to support his cocaine addiction and murder. When Mack turned her back, Wallace pulled out a pillowcase that he had brought with him and placed it around her neck. As Mack resisted, Wallace put more pressure on the pillowcase and explained that this was a robbery. He and Mack went into the bedroom, where he commanded Mack to give him all the money she had, including her automated teller machine (ATM) card and personal identification number (PIN). After Mack gave him everything, Wallace raped her. Afterwards, Wallace forced Mack to re-dress. He then tightened the pillowcase around Mack's neck until she passed out. He added another garment to keep the pillowcase from loosening. Wallace checked on Mack's baby and stayed until the baby went to sleep. He left the apartment, walked down the street, and called a cab. Later, Wallace attempted to use the ATM card and discovered that Mack had given him an incorrect PIN. See id. at 335-36.

*Betty Baucom Murder*

In March 1994, Betty Baucom lived in an apartment in Charlotte with her adopted daughter. Baucom, an assistant manager at the Bojangles' restaurant on Central Avenue, failed to report to

9

work as scheduled on March 9 and 10, 1994. After repeated calls to her went unanswered, Baucom's supervisor and Baucom's mother called the police department and reported Baucom as a missing person.

Officer Gregory Norwood of CMPD received a call on the morning of March 10, 1994, to respond to an apartment where Baucom's body had been found by maintenance personnel. Norwood found Baucom's body lying face down on her bed with a towel around her neck.

Dr. Sullivan performed an autopsy on Baucom's body on March 11, 1994. He observed blunt-trauma injuries and evidence of strangulation, including a ligature in place around her neck. The ligature consisted of a small sheet or pillowcase in a knot with an additional towel wrapped between the skin of the neck and the sheet. Dr. Sullivan also observed injuries that he testified were consistent with a struggle. Dr. Sullivan opined that the cause of Baucom's death was strangulation.

Wallace confessed that he went to Baucom's apartment and told her he needed to use the phone. They talked for a while, and as he was getting ready to leave, he placed a choke hold on Baucom. Wallace told Baucom this was a robbery and demanded the alarm code, keys, and combination to the safe for the Bojangles' restaurant where Baucom was the manager. Baucom was very upset, and she took approximately thirty minutes to produce the safe's combination. Wallace then released the choke hold. He remembered Baucom asking, "Why did you do that to me?" He responded that he was a sick person and that he had hurt many people. Baucom then embraced Wallace, said that she forgave him, and told him he needed help. Wallace became enraged and grabbed Baucom by the throat, slammed her to the floor, and then scuffled with her. Wallace got Baucom to her feet and took her into the bedroom, where he told her he wanted her to perform oral sex on him. She grabbed his penis and started pulling and scratching. Wallace and Baucom began

to scuffle again, and Baucom bit him on his shoulder and scratched his abdomen. Wallace was able to tighten a towel around Baucom's neck until she was nearly unconscious. He then raped her. Afterwards, Wallace told Baucom to put her clothes back on. He placed a towel around her neck and asked her if she had any money. Baucom gave him the money in her purse, and he took a gold chain from around her neck.

After strangling Baucom to death, Wallace took her television and left in her car. He sold the television for drugs. He then returned to Baucom's apartment to make sure Baucom was dead and to take her VCR. While in Baucom's apartment, Wallace used a wet cloth to wipe off the phone, door knobs, and the wall on which some of the struggle took place. He used money from Baucom's purse, the gold chain, and the VCR to purchase more drugs. Wallace kept Baucom's car for almost two days. He then left the car in a parking lot because he thought police officers were following him. He wiped the interior and most of the exterior of the car, but did not wipe the trunk lid. See id. at 336-37.

*Brandi Henderson Murder*

In March 1994, Brandi Henderson was living in an apartment with her boyfriend, Verness Lamar Woods, and their ten-month-old son, T.W. On March 9, 1994, Woods was at the apartment taking care of T.W. because Henderson had a doctor's appointment. As Henderson was leaving, Wallace appeared at the apartment to say that he was leaving town. He stayed for only a few minutes and then left. Henderson returned during the afternoon, and at around 5:00 p.m., Woods left to go to work. When Woods left, Henderson and T.W. were alone in the apartment, the apartment was neat and clean, and the front door was locked. Woods returned to the apartment around midnight to find the front door unlocked, items scattered about the living room, and the stereo missing.

Woods found T.W. in his bedroom sitting on the bed and gasping for air with something white coming out of his mouth and a pair of shorts around his neck. Woods immediately removed the shorts, which were tied tightly around T.W.'s neck. Woods then realized that Henderson was lying face down on the bed. Woods rolled her onto her back and saw that towels were tied around her neck and that her face was blue. Woods removed the two towels from Henderson's neck and called 911. He administered CPR pursuant to instructions from the 911 operator. Police officers arrived, found Henderson was dead, and took T.W. to the hospital.

Dr. Sullivan performed an autopsy on Henderson's body on March 10, 1994. Dr. Sullivan observed minor blunt-trauma injuries and lacerations. He also observed evidence of strangulation including small hemorrhages in the eyes, over the skin of the face and neck, in the muscles in the front of the neck, and in the lining of the voice box. Dr. Sullivan opined that the cause of death was strangulation.

Wallace confessed that he planned to murder Henderson on Tuesday morning, but when he arrived at the apartment, Woods was present. Wallace left the apartment, found Baucom's apartment in the same complex, and murdered Baucom. He returned to Henderson's apartment the same night when he knew Woods would be at work. Wallace pretended he had something to leave for Woods. He and Henderson talked for a while, and then Wallace asked for something to drink. When Henderson reached into the cabinet, Wallace choked her and told her to go into the bedroom. Wallace demanded money, and Henderson gave him a Pringles can filled with approximately twenty dollars worth of coins. Wallace then told Henderson to remove her clothes, which she did. Henderson grabbed her son, laid him across her chest, and turned his head away so he could not see what was going on. Wallace raped Henderson with T.W. lying across Henderson's chest.

Afterwards, Wallace told Henderson to put her clothes back on. Wallace went into the bathroom, got a towel, and wiped off everything. Thereafter, he folded the towel, put it around Henderson's neck, and strangled her to death. He also tied the towel in a knot around her neck. T.W. started crying, so Wallace gave him a pacifier. He looked for something T.W. could drink but could not find anything. Wallace then took another towel and tied it tightly around T.W.'s neck so it would be difficult for him to breathe and so he would stop crying. T.W. stopped crying and laid down next to his mother's body. Wallace then disconnected the stereo and loaded it and a television into Baucom's car. Before leaving, Wallace took some food that had been delivered and the Pringles can of coins. He sold the television and stereo for $175.00, which he used to purchase crack cocaine. See id. at 337-39

*Deborah Slaughter Murder*

In March 1994, Debra Slaughter lived alone in an apartment in Charlotte. On March 12, 1994, Slaughter's mother, Lovey Slaughter, went to her daughter's apartment to return a picture she had taken a few days before. Lovey anticipated letting herself in because Slaughter was supposed to be at work. When Lovey arrived, she discovered that the door was not locked. As Lovey walked through the door, she saw Slaughter's body lying on the floor and called 911.

Officer Ronnie Chambers of CMPD entered Slaughter's apartment and found a purse with its contents scattered on the floor. Chambers then noticed Slaughter's body lying on the floor face-up. There was white fabric in Slaughter's mouth and a towel around her neck. Chambers also observed several puncture wounds in Slaughter's chest.

On March 14, 1994, Dr. Sullivan performed an autopsy on Slaughter's body. During the external examination, he observed a ligature around Slaughter's neck and a sock balled up and

stuffed into her mouth, holding her mouth open. The evidence of strangulation included the ligature around Slaughter's neck and hemorrhages in the conjunctiva. The ligature was comprised of two towels, the inner towel encircled around the neck, and the outer towel tied tightly in a single knot. Dr. Sullivan also observed blunt-trauma injuries and sharp-trauma injuries caused by thirty-eight stab wounds to the chest and abdomen, fifteen of which individually could have been fatal. Dr. Sullivan opined that Slaughter's death was caused by multiple stab wounds, with strangulation as a contributing factor in the death.

Wallace confessed that he went to Slaughter's apartment to use drugs with her. He realized that Slaughter had some money when she said she could not buy any drugs because she had to make her money last until the next week. Wallace asked Slaughter to get him something to drink. As Slaughter turned around, Wallace put a towel he had brought with him around Slaughter's neck and tightened it. Wallace stated that Slaughter then realized that he was the one who had killed two girls in nearby apartments. Wallace told Slaughter to remove her clothes and to perform oral sex on him. Slaughter refused and Wallace then raped her. Afterwards, Wallace told Slaughter to put her clothes on. Knowing that Slaughter carried a knife in her purse at all times, Wallace asked Slaughter to empty the contents of her purse onto the floor, which she did. Wallace kicked the knife away and then told Slaughter to open the wallet and give him everything in it. As Slaughter did this, Wallace grabbed the knife. Slaughter handed him forty dollars from the wallet. Slaughter then hit Wallace and screamed for the police. Wallace tightened the towel around Slaughter's neck until she fell to the floor and started kicking. Wallace tightened the towel more and tried to sit on top of Slaughter's legs to keep her from alerting the neighbor downstairs. Wallace went to the bathroom to retrieve another towel, which he tied with the first around Slaughter's neck. He then repeatedly stabbed

Slaughter with the knife from her purse. Wallace washed the knife clean and wiped his fingerprints from it and placed it back with the contents of Slaughter's purse on the floor.

Wallace left Slaughter's apartment to purchase crack cocaine. He returned to Slaughter's apartment to smoke it. When he left the second time, he took a coat, a baseball hat, and a butcher knife from Slaughter's apartment. He threw all three items away after leaving the apartment. See id. at 339-40.

*The Investigation*

Following the Henderson murder on March 9, 1994, which was discovered prior to the Baucom murder, investigators noticed similarities between the Henderson murder and the Mack murder. Both victims were black females, there was no forced entry, and there was a ligature used in both cases.

On March 10, 1994, investigators held a meeting to discuss similar cases involving strangulation. During this meeting, investigators learned that Baucom had been discovered in the same apartment complex as Henderson. The Baucom murder exhibited characteristics similar to the Mack and Henderson cases. Wallace became a suspect in these crimes when investigators asked victims' family members and friends for the names of persons the victims might have allowed into their apartments. Wallace's name was listed.

On March 11, 1994, after Baucom's vehicle was recovered, police compared a palm print lifted from Baucom's vehicle to Wallace's prints and found a match. Investigators then began an extensive search for Wallace. On March 12, 1994, during the search for Wallace, investigators learned that Slaughter had been discovered in her apartment. The Slaughter case exhibited characteristics similar to the Mack, Henderson, and Baucom cases.

Between 5:30 and 6:00 p.m. on March 12, 1994, Wallace was arrested on an outstanding warrant for larceny. During questioning, after Wallace had been advised of his Miranda rights, investigators told Wallace of the evidence connecting him to the crimes, including photos of him attempting to use Mack's ATM card and the matching palm print from Baucom's car. Wallace confessed to the murders of Love, Hawk, Spain, Jumper, Stinson, Mack, Baucom, Henderson, and Slaughter, as well as to the murders of Sharon Nance and Tashanda Bethea.[2]

*The Trial*

Wallace did not testify at trial but presented evidence from three expert witnesses. The defense theory of the case was that Wallace was mentally ill and unable to form the specific intent necessary to commit first-degree murder. On January 7, 1997, the jury found Wallace guilty of nine counts of first-degree murder, each on the basis of malice, premeditation, and deliberation, and under the felony murder rule. In addition, the jury found Wallace guilty of eight counts of first-degree rape, one count of second-degree rape, two counts of first-degree sexual offense, two counts of second-degree sexual offense, one count of assault with a deadly weapon, one count of assault on a child under the age of twelve, and five counts of robbery with a dangerous weapon.

At the capital sentencing proceeding, the defense presented testimony from a forensic social worker who had developed a psychosocial profile of Wallace, a number of childhood friends, neighbors and teachers, and a clinical psychologist who testified that Wallace suffered from at least five diagnosable mental illnesses. The State did not present any direct evidence of aggravating factors but called one rebuttal witness, Sadie McKnight, Wallace's ex-girlfriend. The jury

---

[2] The Bethea murder was committed in South Carolina, and the State chose not to prosecute the Nance murder with the other nine North Carolina murders.

considered forty mitigating circumstances, and in each case found at least twenty-five.[3]  The jury

recommended a sentence of death for each of the nine counts of first-degree murder.  On January 29,

1997, the trial court entered judgment in accordance with the recommendations and sentenced

Wallace to nine death sentences.  In addition, the trial court sentenced Wallace for his other

convictions.[4]

## PROCEDURAL HISTORY

Wallace filed a direct appeal to the North Carolina Supreme Court challenging his

convictions and death sentences.  The North Carolina Supreme Court affirmed his sentence on May

5, 2000. State v. Wallace, 528 S.E.2d 326 (N.C. 2000).  The United States Supreme Court denied

Wallace's Petition for Writ of Certiorari on November 27, 2000. Wallace v. North Carolina, 531

U.S. 1018 (2000).

On December 28, 2000, Ann B. Peterson and Thomas K. Maher were appointed to represent

Wallace in state post-conviction proceedings.  On November 15, 2001, Wallace filed a Motion for

Appropriate Relief ("MAR") in the Mecklenburg County Superior Court.  The State filed its Answer

on September 11, 2002, and on October 25, 2002, Wallace filed amendments to his MAR.

On August 10-12, 2004, the Mecklenburg County Superior Court held an evidentiary hearing

on Wallace's MAR claims.  On May 18, 2005, the court filed an Order denying Wallace's MAR.

On July 14, 2005, Wallace filed a Petition for Writ of Certiorari in the North Carolina Supreme

Court which was denied. State v. Wallace, No. 241A97-2 (N.C. Nov. 3, 2005).

On November 8, 2005, Wallace filed the instant Petition for Writ of Habeas Corpus in which

---

[3] In three cases, (Baucom, Henderson and Slaughter), the jury found twenty-six mitigating circumstances.

[4] The trial court arrested judgment on the assault with a deadly weapon conviction.

he challenges his first-degree murder convictions and his death sentences. (Doc. No. 1: Pet.). The State filed a Response and a Motion for Summary Judgment on March 2, 2006. (Doc. No. 8). On April 19, 2006, Wallace filed a Response to the State's Motion for Summary Judgment and his own Motion for Summary Judgment. (Doc. No. 14).

## DISCUSSION

For claims adjudicated on the merits by the North Carolina courts, this Court's review is limited by the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.A. § 2254, as interpreted by the Supreme Court in Williams v. Taylor, 529 U.S. 362 (2000). This Court may not grant relief unless the North Carolina court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West Supp. 2006).

A state court's decision is contrary to clearly established federal law under § 2254(d) where it "applies a rule that contradicts the governing law set forth" by the United States Supreme Court or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [that] precedent." Williams, 529 U.S. at 405-06. A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. A state court decision also may be an unreasonable application of clearly established federal law if it

"applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable [or] fails to apply the principle of a precedent in a context where such failure is unreasonable." Robinson v. Polk, 438 F.3d 350, 355 (4th Cir. 2006) (internal quotation marks omitted).

The Supreme Court has cautioned that an unreasonable application of federal law differs from an incorrect application of federal law. Williams, 529 U.S. at 410. Thus, "[u]nder 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. In deciding whether a state court's application of clearly established federal law is unreasonable within the meaning of § 2254(d), a federal habeas court should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. Factual determinations made by the state court, however, "shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1) (West Supp. 2006).

**CLAIM I: Change of Venue**[5]

Wallace asserts that due to the extensive pretrial publicity surrounding his case, he was unable to get an impartial jury and a fair trial in Mecklenburg County. He claims that the trial court's refusal to grant his motions for a change of venue deprived him of his Sixth, Eighth and

---

[5] In this case, there are 12 volumes of transcripts covering jury selection. References to those transcripts appear as (Jury Selection Tr. __). There are 14 volumes of transcripts covering pre-trial motions and hearings. References to those transcripts will identify the type of motion or hearing. References to the transcripts covering the trial through sentencing appear as (Trial Tr. __). References to the MAR evidentiary hearing transcripts appear as (MAR Hr'g Tr. _).

Fourteenth Amendment rights to the U.S. Constitution. Wallace raised this claim on direct appeal, and the North Carolina Supreme Court rejected it on the merits. Wallace, 528 S.E.2d at 346.

Wallace was arrested on March 12, 1994. During the next two months, there was extensive print and broadcast media coverage of the murders, as well as numerous stories about Wallace himself. The press coverage discussed the fact that Wallace's fingerprint had been found on one victim's car. Some of the newspaper articles reported that police in Charlotte, South Carolina, and Washington were investigating whether Wallace was responsible for other, unsolved murders of young black women in those areas. It also was reported that Wallace had been charged in South Carolina with the murder of a young woman and the attempted rape of another. At least one article compared Wallace to well-known serial killers, and some coverage included the opinions of experts in the field about how serial killers operate and how they avoid detection. Additionally, the CMPD held two press conferences during which a few officers expressed confidence that Wallace was responsible for the murders. Also during this time, the Charlotte City Council held a televised public meeting to discuss the case. Two of the Council members opined that the community's main priority should be to try, convict, and execute Wallace. Interviews and comments from family and friends of the victims and newspaper editorials criticizing the police investigation of the murders were featured. ®. at 140-77).

Wallace moved for a change of venue on August 9, 1994. The trial court held a hearing on the motion from January 23-27, 1995. The court denied the motion, concluding that Wallace had not established "a reasonable likelihood that pretrial publicity would prevent him from receiving a fair and impartial trial in Mecklenburg County." (Venue Mot. Tr. 483, Jan. 23, 1995). Wallace renewed his motion to change venue on September 30, 1996, and presented additional evidence of

pretrial publicity. The trial court denied the motion. Wallace introduced evidence to supplement his motion to change venue several more times before and during the trial. The trial denied each renewed motion to change venue.

Among the protections guaranteed by the Sixth Amendment is the right to a fair trial by a panel of impartial jurors that determines a verdict "based upon the evidence developed at trial." Irvin v. Dowd, 366 U.S. 717, 722 (1961). An impartial jury is one free from extraneous, prejudicial influence, whether it comes from inside or outside the jury room. See Parker v. Gladden, 385 U.S. 363, 363-66 (1966) (finding habeas petitioner was deprived of his right to an impartial jury because of prejudicial remarks made to the jury by a bailiff).

The U.S. Supreme Court has found that defendants were denied a fair trial due to media publicity in two types of situations. See Murphy v. Florida, 421 U.S. 794, 799 (1975) (outlining the two situations in which pre-trial publicity will be viewed as depriving a defendant of a fair trial). The first transpired when the circumstances under which the trial was held were presumptively prejudicial. See Sheppard v. Maxwell, 384 U.S. 333 (1966) (presuming prejudice due to extremely inflammatory pretrial publicity, the coinciding re-election campaign of the trial judge, pretrial media interviews with jurors, and press presence within the bar of the court and in the room adjacent to the jury room); Estes v. Texas, 381 U.S. 532 (1965) (presuming prejudice where trial took place in circus-like atmosphere created, in part, by press sitting within the bar of the court, which was overrun by television cameras); Rideau v. Louisiana, 373 U.S. 723 (1963) (presuming prejudice where, among other things, a 20-minute film of the defendant's confession was broadcast three times by a television station in the community where the crime and trial took place). The second situation occurred when the jury-selection process permitted an inference of actual prejudice. See Murphy,

421 U.S. at 799.  In <u>Irvin v. Dowd</u>, the Court inferred actual prejudice where, due to inflammatory publicity immediately prior to trial, eight of the defendant's twelve jurors had formed an opinion before the trial began that the defendant was guilty.  366 U.S. at 727-28.  Some of the jurors stated that "it would take evidence to overcome their belief" in the defendant's guilt.  <u>Id.</u> at 728.

      <u>Rideau</u>, <u>Estes</u>, and <u>Sheppard</u> cannot be read to hold that juror exposure to publicity about the defendant or the crimes presumptively deprives the defendant of due process. <u>See</u> <u>Murphy</u>, 421 U.S. at 799.  The U.S. Supreme Court does not require that qualified jurors be totally ignorant of the facts and issues involved in a case in order to be viewed as impartial. <u>See</u> <u>id.</u> at 799-80.

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

<u>Irvin</u>, 366 U.S. at 723.  A determination that a defendant's trial was fundamentally unfair must be based upon the totality of circumstances. <u>See</u> <u>Murphy</u>, 421 U.S. at 799.

      In this case, nine of Wallace's twelve jurors had read, seen or heard pretrial publicity about the case (Singleton, Arnold, Hall, Wells, Cavacos, Davis, Bishop, Monteith, and Grier).  All nine stated that their only exposure to pretrial publicity was around the time of the murders and Wallace's arrest.  Of those nine jurors, three (Singleton, Wells and Hall) either remembered nothing that they had heard or read, or were not asked what they remembered from their exposure to pretrial publicity. The remaining six remembered only one or two details of the crimes, for example that some of the victims worked at fast food restaurants, or recognized Wallace's name or the name of a victim but no other details.  All nine indicated that they could set aside what they had heard or read prior to trial and decide the cases solely on the evidence and law presented at trial.

Of Wallace's twelve jurors, only one stated that he had formed an opinion regarding Wallace's guilt. However, that opinion was not formed prior to voir dire but was based upon defense counsel's admission that Wallace had killed the victims. (Jury Selection Tr. Vol. 9 at 771-73, 775, Oct. 28, 1996).[6]

During her opening remarks to a panel of jurors, defense counsel stated the following:

> The fact that [Wallace] killed them is not in dispute. Now, you may be saying or asking, "Why are we here? What does that mean in light of this trial?" The reason for that is that the Prosecution has charged Henry Wallace with first degree murder, and to that charge of first degree murder, Mr. Wallace has pleaded not guilty.
> I believe the Prosecution told you earlier that there are other degrees of murder, second degree being one of the other types of murder. But, what he has been charged with and what he has plead not guilty to is first degree murder. That does not mean that there is not going to be evidence presented in this courtroom from which you could find him guilty of the crime of murder, second degree murder or whatever else that the Judge instructs you on. That is to say that Mr. Wallace is pleading not guilty to first degree murder in every case.

(Id. at 699-700).

Under questioning by defense counsel, Juror Bishop, who was a member of the aforementioned panel, stated that he had not formed an opinion regarding Wallace's guilt prior to being summoned for jury duty. (Id. at 771-73, 775). However, he acknowledged that he had subsequently formed the opinion that Wallace was guilty because of counsel's previous statements, coupled with what he had previously heard and read. (Id. at 773). Juror Bishop never stated that he had formed an opinion that Wallace was guilty of *first*-degree murder. In fact, when specifically asked by defense counsel whether his opinion was based upon something she had said that would indicate that Wallace was guilty of first degree murder, his response was in the negative, "Not,

---

[6] The Court is citing the volume number depicted in handwriting on the front of the Jury Selection binders. The Court also notes that the date of October 28, 1996 is actually mis-marked on the cover sheet of the volume as November 2, 1996.

specifically first degree." (Id. at 772).

Where the "atmosphere in the community or courtroom is sufficiently inflammatory," jurors' assurances of impartiality may be suspect. Murphy, 421 U.S. at 802. Wallace asserts that the pretrial publicity in his case was so extensive and inflammatory, that prejudice must be presumed and his jurors' assurances of impartiality disregarded. The Court is unconvinced.

At the conclusion of the January 1995 hearing on Wallace's motion to change venue, the trial court found as a matter of fact that media coverage of the murders was widespread and that some of it was inflammatory and misleading. (Venue Mot. Tr. 478-79, Jan. 23, 1995). However, the trial court also found that much of the coverage was factual and informative and not inflammatory or prejudicial. (Id. at 479). The trial court also found that some of it was favorable to Wallace. (Id. at 479). Additionally, the court found that there was no evidence that any police representative knowingly released false or misleading information to the media. (Id. at 481).

A finding of fact by a state court is presumed to be correct, and Wallace bears the burden of rebutting that presumption "by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1). Although the bulk of the exhibits introduced by Wallace to support his motion and renewed motions for change of venue are not part of the record before this Court, the Court has reviewed those newspaper articles that were included in the state court record for Wallace's direct appeal. ®. at 140-179). Nothing in those articles rebuts the presumption of correctness of the trial court's findings of fact. Although these particular articles contain little information that is favorable to Wallace, they also contain little that is inflammatory. In fact, they are largely factual in nature. See Beck v. Washington, 369 U.S. 541 (1962) (recognizing that high level of publicity does not necessarily deprive a defendant of ability to obtain a fair trial where the publicity has been largely factual). For

example, Wallace complains that the media reported that he was responsible for multiple homicides in addition to the ten Charlotte murders. None of the articles in the record before this Court support Wallace's assertion. The articles report that Wallace had been charged with a murder in South Carolina and that various police departments, including the CMPD, were investigating whether he was responsible for some of the unsolved murders in their jurisdictions. Wallace has failed to show that these reported facts were inaccurate.[7]

The evidence before this Court shows that the overwhelming majority of stories about Wallace and the murders appeared in the media between March 1994 and May 1994, the latter date being more than two years before jury selection began in this case. Between May 1994 and the beginning of jury selection, there were periods of time during which there was no media coverage of Wallace and the murders. (Venue Mot. Tr. 296, Jan. 23, 1995). While it is true that there was some media coverage during jury selection and the trial, Wallace has failed to show that there was the "barrage of inflammatory publicity immediately prior to trial," Murphy, 421 U.S. at 798, that created such a presumption of prejudice that jurors' protestations of impartiality should not be believed, see Irvin, 366 U.S. at 725-28. Indeed, none of Wallace's twelve jurors were exposed to any substantive media coverage during this time.[8] The effect of the passage of time between the substantial post-arrest media coverage in the spring of 1994 and jury selection in the fall of 1996 is

_____

[7] The Court notes that a number of the articles in the record on appeal are from *The York Observer*, which served York, Lancaster and Chester. The Court takes judicial notice that York, Lancaster and Chester are counties in South Carolina and that residents of South Carolina are not eligible to serve on juries in North Carolina.

[8] Only three jurors stated that they recently had seen or heard something about the case in the media, and there is no indication that that information included details about the murders or about Wallace. Juror Wells stated that she had seen something indicating that jury selection was proving to be difficult. (Jury Selection Tr. Vol. 3 at 275, Oct. 14, 1996). Juror Cavacos stated that she had seen or heard that jury selection had begun. (Jury Selection Tr. Vol. 6 at 1928). Juror Arnold stated that he had heard something indicating that not many family members of the victims were attending the pretrial proceedings. (Jury Selection Tr. Vol. 4 at 572).

reflected in the fact that 50% of Wallace's jurors either had never heard of him or the murders or had forgotten everything that they had heard or read about the murders. The remaining 50% could remember only Wallace's name or one or two details about the murders.

Furthermore, Wallace has not shown that his jury was drawn from or influenced by a community that was deeply hostile to him at the time of trial. The U.S. Supreme Court has recognized that in a community where most of the veniremen acknowledge a "disqualifying prejudice," the reliability of the others' assurances of impartiality may be in doubt. Murphy, 421 U.S. at 803. In Irvin v. Dowd, for example, 90% of those veniremen asked had formed an opinion regarding the defendant's guilt, and on that ground, the trial court excused for cause 268 of the 430 veniremen. 366 U.S. at 727. Eight of Irvin's twelve jurors thought he was guilty but stated that they could set aside that opinion and render an impartial verdict. Id. In light of the "pattern of deep and bitter prejudice shown to be present throughout the community," the U.S. Supreme Court was unwilling to trust the asserted impartiality of Irvin's jurors. Id. at 727-28 (internal quotation marks omitted).

In Wallace's case, on the other hand, of the 138 veniremen examined, only twenty-nine had formed an opinion regarding Wallace's guilt based upon pretrial publicity.[9] While that may be twenty-nine more than would occur in the trial of someone who was totally obscure, someone charged with murdering eleven people[10] cannot expect to remain anonymous. That only twenty-nine veniremen had formed a potentially disqualifying opinion "by no means suggests a community with

---

[9] These numbers are supplied by Wallace. The State does not dispute them, so the Court will assume that they are accurate.

[10] Wallace was charged with killing ten women in Charlotte, and one in South Carolina.

sentiment so poisoned against [Wallace] as to impeach the indifference of jurors who displayed no animus of their own." <u>Murphy</u>, 421 U.S. at 803.[11]

Finally, Wallace has presented no evidence of a "circus-like" atmosphere surrounding the actual trial. If members of the media were present in the courtroom, or in the courthouse, for that matter, Wallace has presented no evidence of it. <u>See</u> <u>Sheppard</u>, 384 U.S. at 354-55. Nor is there evidence of media focus on the jurors or of juror exposure to media reports of the trial. <u>See</u> <u>id.</u> at 353. In short, Wallace has failed to show that "the setting of the trial was inherently prejudicial or that the jury-selection process . . . permits an inference of actual prejudice." <u>Murphy</u>, 421 U.S. at 803. Consequently, he has failed to show that the North Carolina Supreme Court's rejection of this claim resulted in a decision that was either contrary to or an unreasonable application of clearly established federal law. <u>See</u> 28 U.S.C.A. § 2254(d)(1).

**CLAIM II: <u>Miranda</u>**

Wallace contends that the trial court erred when it denied his motion to suppress his pretrial statements to police. Wallace asserts that police investigators deliberately delayed advising him of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), in order to elicit a confession from him. Wallace claims that because this delay was deliberate, his subsequent confessions were involuntary

---

[11] At each of his change of venue hearings, Wallace presented the results of an opinion poll conducted between the time of his arrest and the date of the hearing. The first, by Robert M. Bohm, a professor of criminal justice at the University of North Carolina at Charlotte ("UNCC"), indicated that of those Mecklenburg County residents polled, roughly 94% had heard of the murders, and 52% believed that, based upon what they knew, the man arrested for them was guilty. (Venue Mot. Tr. 308, 311, Jan. 23, 1995). The Court notes that the poll was taken on June 28, 1994, more than two years before the start of jury selection. The second, by Katherine M. Jamieson, also a professor of criminal justice at UNCC, indicated that of those potential Mecklenburg County jurors polled, roughly 91% had heard of the murders, and 51% believed that, based upon what they knew, the man arrested for them was guilty. (Venue Mot. Tr. 29, Sept. 30, 1996). The Court notes that this poll was conducted on July 25, 1995, more than a year before the start of jury selection.

The relevance of these opinion polls is severely undercut by the fact that by the time of jury selection, Wallace's jurors had minimal recollection of pretrial publicity and only 21% of veniremen had formed an opinion as to his guilt.

and inadmissible at trial under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution. Wallace raised this claim before the North Carolina Supreme Court on direct appeal. The court rejected the claim on the merits. Wallace, 528 S.E.2d at 346-51.

On November 7, 1994, Wallace filed a motion to suppress statements he made to police during a series of interviews which began in the evening of March 12 and continued into the evening of March 13, 1994. The trial court held an evidentiary hearing on the motion at the March 27, 1995 Criminal Session of the Mecklenburg County Superior Court. On April 20, 1995, the trial court denied the motion, and on October 3, 1996, the court filed a written order to that effect that contained extensive findings of fact and conclusions of law.

The North Carolina Supreme Court summarized the trial court's findings of fact, as follows:

> Defendant was arrested 12 March 1994 at approximately 5:00 p.m. at a friend's apartment. Officers Gilbert Allred and Sidney Wright of the Charlotte-Mecklenburg Police Department placed defendant under arrest pursuant to an outstanding order for arrest on a misdemeanor larceny charge. The officers transported defendant to the Law Enforcement Center (LEC) rather than the Intake Center where prisoners were normally taken. Both arresting officers testified that they observed no indications that defendant was under the influence of alcohol or drugs. He was "very calm and collected" but appeared tired and "a little wrinkled." Defendant was cooperative with the officers and did not object to being taken to see investigators at the LEC rather than the Intake Center. At the LEC, defendant was placed in an interview room and released to the custody of other officers.
> . . . Investigators Mark Corwin and Darrell Price met with defendant in an interview room at the LEC beginning at 6:43 p.m. that same day. The officers provided defendant with food and drink and allowed him regular breaks to use the restroom. There was no evidence defendant was deprived of food, drink, or the opportunity to use the restroom at any time during the entire interview process. During the initial interview, investigators and defendant talked about sports, his employment and military experience, and his biographical information. Defendant also voluntarily raised the issue of his drug use. He gave inconsistent answers about the last time he had used crack cocaine, indicating on one occasion that he had last used drugs the week before and on another occasion that he had used drugs that morning. However, there were no indications defendant was under the influence of any impairing substance or had been deprived of sleep at any time during the

28

interviews. At 10:00 p.m., the investigators advised defendant of his *Miranda* rights which defendant said he understood and agreed to waive. Prior to administering the *Miranda* rights, the officers did not ask defendant about his drug use or the victims for whose murders he was a suspect. Officers asked no questions designed to elicit an incriminating response. However, defendant was under arrest and not free to leave pursuant to the larceny charge.

. . . [A]fter defendant was advised of his *Miranda* rights, Price and Corwin questioned defendant about the latest murders. Investigators C.E. Boothe, Jr., and William Ward, Jr., also questioned defendant during the evening of 12 March and the early morning of 13 March 1994. Investigator Tony Rice met with defendant at 5:07 a.m. on 13 March 1994. Defendant greeted Rice and was happy to see him because they knew each other. Questioning continued after Rice entered the room, and defendant became emotional when he was asked about his girlfriend, Sadie McKnight. Rice asked defendant if he was religious and whether he would mind if Rice said a prayer. Defendant said he did not mind. He cried during the prayer. After the prayer, defendant sighed and then wrote a list of the names of the victims he had killed. He later gave a detailed, recorded confession concerning each of the victims. Defendant was fed while he gave his confession and was allowed to sleep from 7:30 a.m. until 11:45 a.m.

. . . [A]t some point during the interviews, defendant requested to see his girlfriend and to hold his daughter. Ward advised defendant that the police would attempt to contact McKnight and Wanda Harrison, the mother of defendant's daughter. He also advised defendant that the police had no control over whether either would come to the station. . . . [T]he officers did not view this request as a condition for defendant making a statement.

. . . [T]here was no evidence defendant was coerced or intimidated in any way, nor was there evidence defendant indicated he wished to stop talking with officers or wanted to speak with an attorney. Magistrate Karen Johnson came to the LEC around noon and conducted a first appearance for defendant on murder warrants obtained by investigators. . . . Magistrate Johnson followed normal procedures and . . . her ability to be neutral and detached was not affected by going to the LEC.

. . . [A]fter his appearance before Magistrate Johnson, defendant continued cooperating with police, providing individual confessions to each murder and taking police to recover articles of evidence. At no time did defendant request an attorney or indicate a desire to stop talking with police.

Id. at 347-48. As noted previously, a finding of fact by a state court is presumed to be correct, and

Wallace bears the burden of rebutting that presumption "by clear and convincing evidence." 28

U.S.C.A. § 2254(e)(1).

Wallace does not contest any of these findings of fact. Instead, he argues that because

investigators deliberately delayed giving him <u>Miranda</u> warnings until after they had questioned him for several hours, his subsequent confessions were inadmissible at trial pursuant to <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004).

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In <u>Miranda</u>, the Supreme Court held that the admissibility at trial of any confession obtained through custodial interrogation was dependent upon whether the suspect was warned of his rights under the Fifth and Sixth Amendments prior to making the statement. 384 U.S. at 444-45. In <u>Seibert</u>, the Court reviewed a situation in which an inculpatory statement was obtained through a two-step process, characterized as a "question first" approach. 542 U.S. at 604. In that case, the police intentionally withheld <u>Miranda</u> warnings until the suspect had confessed under questioning. <u>Id.</u> at 605-06. They then obtained a waiver of <u>Miranda</u> rights from the suspect and confronted her with her pre-warning statements until she repeated the information she had given before she was Mirandized. <u>Id.</u> A four-Justice plurality concluded that in a situation where interrogators do not issue warnings until after their interrogation yields a confession, subsequent <u>Miranda</u> warnings "will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." <u>Id.</u> at 613.

This Court need not reach the question of whether the facts of Wallace's interrogation are sufficiently analogous to apply the holding in <u>Seibert</u>.[12] <u>Seibert</u> is not applicable to Wallace's case

---

[12] Justice Kennedy, who provided the fifth vote for suppression of Seibert's statement, concurred in the judgment of the Court on narrower grounds. Therefore, his opinion represents the holding of the <u>Seibert</u> Court. <u>See</u> <u>United States v. Mashburn</u>, 406 F.3d 303, 308 (4th Cir. 2005) ("'When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds.'" (quoting <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977))). Under Justice Kennedy's formula, the admissibility of post-warning statements is governed by <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), unless the "question-first" strategy is used deliberately. <u>See</u> <u>Seibert</u>, 542 U.S. at 622 (Kennedy, J., concurring). If the "question-first" strategy is deliberately

because it was decided long after Wallace's conviction became final, and thus was not clearly established law when the North Carolina Supreme Court rejected his Miranda claim on direct appeal. Under, § 2254(d)(1), a federal court may not grant habeas relief on the basis of claims rejected on the merits by state courts unless the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." "[C]learly established Federal law" refers to the holdings of Supreme Court decisions "as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. When the state appellate court rejected Wallace's Miranda claim, the clearly established federal law governing the admissibility of post-Miranda confessions was Oregon v. Elstad, 470 U.S. 298 (1985).

In Elstad, officers went to the suspect's home with a warrant for his arrest. 470 U.S. at 300. There, the arresting officer asked Elstad several questions about a neighborhood burglary without first administering Miranda warnings. Id. at 301. Elstad admitted that he was present when the burglary took place and was subsequently transported to the police station where, approximately one hour later, he was advised of his Miranda rights. Id. After knowingly and voluntarily waiving those rights, Elstad gave a full confession. Id.

At trial, Elstad challenged the admissibility of his post-Miranda statement. Id. at 302. The Supreme Court held that a suspect who has responded to unwarned but uncoercive questioning is not thereafter incapable of knowingly and voluntarily waiving his rights and confessing after he has been given the requisite Miranda warnings. Id. at 318. Because custodial interrogation is presumed

---

used, "postwarning statements related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statements are made." Mashburn, 406 F.3d at 309.

to be inherently coercive, unwarned statements that are otherwise voluntary must be excluded from evidence. <u>Id.</u> at 306-07. However, the admissibility of any subsequent post-<u>Miranda</u> confession depends upon whether it was knowingly and voluntarily made. <u>Id.</u> at 309. Because the North Carolina court relied upon <u>Elstad</u> when deciding this claim, this Court's review is limited to whether the state court's application of that case was "objectively unreasonable." <u>Williams</u>, 529 U.S. at 409.

In his Response to the State's Motion for Summary Judgment, Wallace argues that even if the holding of <u>Seibert</u> does not apply, the state appellate court unreasonably applied <u>Elstad</u> by failing to take into consideration that the police <u>intentionally</u> delayed reading him his <u>Miranda</u> rights. (Doc. No. 14: Resp. 47). According to Wallace, the <u>Elstad</u> court held that Elstad's post-<u>Miranda</u> statement was admissible primarily because the failure to give the <u>Miranda</u> warnings initially was inadvertent and in good faith. He argues that in <u>Seibert</u>, the U.S. Supreme Court laid out what a reasonable application of <u>Elstad</u> would require in a case where the failure to give <u>Miranda</u> warnings was deliberate. Therefore, Wallace argues, the state appellate court could not have reasonably applied <u>Elstad</u> to the facts of his case without arriving at the same result that the U.S. Supreme Court did in <u>Seibert</u>. (<u>Id.</u> at 45-47.)

Wallace's arguments are unpersuasive. As an initial matter, Wallace misconstrues the holding of <u>Elstad</u>. The reason that Elstad's post-<u>Miranda</u> statement was admissible was because both it and his pre-<u>Miranda</u> statements were voluntary. <u>See</u> <u>Elstad</u>, 470 U.S. at 318 (explaining that the relevant inquiry is whether both the pre-<u>Miranda</u> and post-<u>Miranda</u> statements were voluntary). Because voluntariness is assessed from the point-of-view of the suspect, the intentions of the police that are unknown to the suspect have no bearing on his capacity to understand and knowingly waive his right to remain silent. <u>See</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 422 (1986) ("Events occurring

outside the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.").  Furthermore, both the plurality and the four dissenting Justices in <u>Seibert</u> rejected an intent-based test for determining whether a post-<u>Miranda</u> confession is voluntary.  <u>See Seibert</u>, 542 U.S. at 623 (O'Connor, J., dissenting) ("[T]he plurality correctly declines to focus its analysis on the subjective intent of the interrogating officer.").  Indeed, the <u>Seibert</u> plurality's holding would apply regardless of whether the failure to read a suspect his rights was intentional or inadvertent in good-faith.  <u>See id.</u> at 621 (Kennedy, J., concurring) (determining that the plurality's test "applies in the case of both intentional and unintentional two-stage interrogations").  If a majority of the members of the U.S. Supreme Court declined in 2004 to consider the subjective intent of the police when assessing the voluntariness of Seibert's confession, then the state appellate court was reasonable to have done the same in 2000 when analyzing Wallace's claim under <u>Elstad</u>.  Therefore, the relevant question is not whether the delay was intentional, but whether Wallace's statements prior to and after the <u>Miranda</u> warnings were voluntary.  <u>See Elstad</u>, 470 U.S. at 318.

A statement is voluntary under the Fifth Amendment only if it is "'voluntary' within the meaning of the Due Process Clause." <u>Id.</u> at 304.  The test for determining voluntariness under the Due Process Clause "is whether the confession was 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" <u>United States v. Braxton</u>, 112 F.3d 777, 780 (4th Cir. 1997) (quoting <u>Hutto v. Ross</u>, 429 U.S. 28, 30 (1976)).  "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986).  However, the use of "threats,

violence, implied promises, improper influence, or other coercive police activity, . . . does not automatically render a confession involuntary." Braxton, 112 F.3d at 780. The test is whether, under the totality of circumstances, the defendant's "will has been overborne and his capacity for self-determination critically impaired." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973) (internal quotation marks omitted).

Wallace argues that his post-Miranda confessions were involuntary because he was arrested on an outstanding charge unrelated to the murders so that investigators could question him about the murders; he was questioned for more than three hours about matters unrelated to the murders without Miranda warnings; he was not told that he was a suspect in the murders until he was read his Miranda rights; he was not read his Miranda rights until the investigators felt that they had established a rapport with him; the same officers conducted the pre- and post-Miranda questioning; he was not given a break except to use the bathroom until he confessed; he was not allowed a change in scenery during the interrogation; an investigator said a prayer during the interrogation; he asked to be allowed to hold his daughter and to talk to his ex-girlfriend, and investigators told him they would try to arrange it; he was not allowed to sleep until after he had made a full and complete confession, and nineteen hours passed between his arrest and his appearance before a magistrate. (Doc. No. 14: Resp. 48-49).

The fact that Wallace did not see a magistrate in the twelve hours between the time of his arrest and initial confession does not render his confession involuntary. See Columbe, 367 U.S. at 601-02 (including delay in taking the accused before a magistrate as only one of many factors relevant to the issue of voluntariness). The circumstances surrounding Wallace's detention and interrogation were not indicative of an environment in which his "will [was] overborne and his

capacity for self-determination critically impaired." Id. at 602. Other than the fact that Wallace was in custody throughout his contact with police, he has not pointed to any behavior on the part of police that could be viewed as coercive. See United States v. Elie, 111 F.3d 1135, 1143 (4th Cir. 1997) (noting factors that would render a confession involuntary and citing cases). His assertion that he was not given a break except to use the bathroom until he confessed simply is not true. He was given a twenty-five minute break for supper, which he was allowed to eat alone in the interview room. (Suppression Hr'g Tr. 182-83, Mar. 27, 1995). He had small breaks throughout the night when investigators left the room. He also had a break when he exchanged his clothes for a jail coverall. That change of clothing did not take place in the interview room where he was questioned by investigators, which directly contradicts Wallace's other assertion that, except for bathroom breaks, he never left the interrogation room. Also factually inaccurate is his assertion that the same officers conducted the pre and post-Miranda questioning. While Investigators Corwin and Price conducted all of the pre-Miranda questioning and some of the post-Miranda questioning, three other investigators participated at various times in the post-Miranda questioning. In fact, neither Price nor Corwin was present when Wallace made his initial confessions. Finally, Wallace has provided no evidence to support his contention that he was deprived of sleep until after he had confessed. The fact that he did not sleep between the time that he was arrested on March 12 until 7:30 a.m. the next morning is not evidence that he wanted to sleep but was not allowed by investigators to do so.

While Wallace's other contentions, listed above, appear to be supported by investigators' testimony at the suppression hearing, Wallace has failed to explain how the investigators' actions, when viewed in their totality, were coercive. Most of Wallace's complaints again focus on the subjective intent of the police. For example, he points to the facts that he was arrested on an

outstanding warrant for an unrelated charge so that police could question him about the murders and that investigators deliberately attempted to establish a rapport with him before giving his Miranda warnings. He has not alleged, however, that his detention on the larceny charge was not legal; nor has he alleged that any member of law enforcement lied to him while he was in custody. During the first two-plus hours of questioning, investigators did not question Wallace about the murders that he was suspected of committing. Instead they asked questions about his background, his military career, sports, and other subjects unrelated to the murders or, for that matter, the larceny. (Suppression Hr'g Tr. 175, 314). They did not ask Wallace any questions designed to elicit an incriminating response. Without any prompting from investigators, he volunteered that he was acquainted with two women (Henderson and Baucom) who recently had been murdered, but he did not say anything that implicated himself in their murders. (Id. at 179-81, 185, 366-67, 383-84). There was also no evidence that he was handcuffed during the interview. (Id. at 174). He was provided regular restroom breaks, as well as food and drink, and, as noted previously, during a twenty-five minute break for supper, he was allowed to eat alone in the interview room. (Id. at 182). In short, Wallace has failed to identify any act on the part of police prior to Miranda warnings that was coercive or that "undermine[d] [his] ability to exercise his free will." Elstad, 470 U.S. at 309.

Wallace does not dispute any of the following, that: prior to any questioning about the murders, investigators read him a complete and accurate version of his Miranda rights; when they read him his rights, investigators informed him that they wanted to talk to him about the crime of murder (Suppression Hr'g Tr. 291-92); he waived his rights; he did not understand the rights as read to him or that he was suffering under some mental, physical or emotional impairment that affected his capacity to knowingly, voluntarily and intelligently waive his rights; he was under the influence

of alcohol, drugs or any other impairing substance when he waived his rights or at any point during his contact with the police. Investigators observed that Wallace was alert and coherent and appeared to be of above-average intelligence. (Id. at 184). Both arresting officers and his interrogators testified that they observed nothing about Wallace that indicated that he was under the influence of an impairing substance during their contact with him.

After Wallace waived his rights, investigators questioned him about the murders for a little over seven hours, including breaks, before he confessed. He has presented no evidence that he was deprived of food, drink, sleep, or restroom breaks during that time. He has not alleged that the conditions in the interrogation room were such that his ability to exercise his free will was undermined. In fact, the one time that he indicated that he was cold, he was given a jacket to wear. Investigators questioned Wallace in ones and twos, and there is no evidence that there were more than two investigators in the room with him at any time. There is no evidence that Wallace was made any promises to induce him to confess[13] or that he was lied to or misled in any way. There is no evidence that he attempted to invoke his rights to silence or to an attorney and was ignored.

Finally, Wallace has failed to show that Investigator Rice's prayer was coercive or critically impaired his ability to exercise his free will. See Schneckloth, 412 U.S. at 225. Wallace likens the prayer to the "Christian burial speech" described in Brewer v. Williams, 430 U.S. 387, 392 (1977), in which a detective made an emotional appeal to the suspect to show officers where he had buried a little girl so that she could be returned to her parents for a Christian burial. In Brewer, the issues

---

[13] Wallace implies an arrangement with investigators that he would talk to them only if he was allowed to talk to his ex-girlfriend, Sadie McKnight, and to hold his daughter. However, the trial court found as a matter of fact that no such agreement existed (R. at 291 ¶ 6), and Wallace has provided no evidence to dispute the trial court's finding of fact.

before the Court were whether Williams was deprived of his right to counsel during a custodial interrogation after judicial proceedings had been initiated and whether he had waived that right. See id. at 394-95. The Court specifically declined to address the issue of whether the "Christian burial speech" rendered Williams's self-incriminating statements involuntary. See id. at 397 ("It is . . . unnecessary to evaluate [whether] . . . Williams' self-incriminating statements were . . . involuntarily made.").

The Court has reviewed the transcript of the suppression hearing and concludes that there is no evidence that any force, coercion or inducement was used to obtain statements from Wallace. Therefore, the trial court's determination that Wallace's confessions were voluntary was not unreasonable in light of the evidence presented at the hearing. See 28 U.S.C.A. § 2254(d)(2). Likewise, the state appellate court's conclusion that Wallace knowingly and intelligently waived his Miranda rights and made a voluntary confession did not result in a decision that was an unreasonable application of clearly established federal law. See § 2254(d)(1).

### CLAIM III: Ineffective Assistance of Counsel

#### A. Ineffective Assistance of Defense Investigator

Wallace claims that Valerie Woodard, the investigator hired to assist the defense, rendered ineffective assistance under the Sixth Amendment because she had a conflict of interest. Wallace raised this claim in his MAR. The MAR court denied the claim on the merits. (MAR Order 13-16, May 18, 2005).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has held that the Sixth Amendment guarantees a criminal defendant the right to

effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 686 (1984). "Counsel" is an individual authorized to practice law.[14] Wallace has provided no evidence that Valerie Woodard was authorized to practice law at the time that she worked as an investigator for the defense. See N.C. Gen. Stat. § 84-4 (prohibiting, unless otherwise permitted by law, any person, except active members of the State Bar admitted and licensed to practice as attorneys-at-law, from practicing law in North Carolina). Nor has Wallace provided any evidence that Woodard, if she was authorized to practice law, performed any legal service for him. See N.C. Gen. Stat. § 84-2.1 (defining "practice of law").

Furthermore, 28 U.S.C.A. § 2254(d)(1) makes it clear that a federal court may not grant habeas relief on the basis of claims rejected on the merits by the state courts unless the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Thus, "an absolute prerequisite for petitioner's claim is that the asserted constitutional right on which it rests derive in clear fashion from Supreme Court precedent" as of the time of the relevant state court decision. Carter v. Ward, 347 F.3d 860, 863 (10th Cir. 2003). Wallace has failed to cite, and this Court is unaware of, any U.S. Supreme Court precedent establishing that the Sixth Amendment entitlement to effective assistance of counsel extends to other professionals assisting a criminal defendant. Consequently, Wallace cannot show that the MAR court's rejection of his claim that his

---

[14] See United States v. Tedder, 787 F.2d 540, 543 (10th Cir. 1986); accord Reese v. Peters, 926 F.2d 668, 670 (7th Cir. 1991) ("The constitutional question is whether the court has . . . authorized [the advocate] to practice law."); United States v. Novak, 903 F.2d 883, 887 (2d Cir. 1990) (interpreting the guarantee of "assistance of counsel" to mean, at the least, "representation by a licensed practitioner" (internal quotation marks omitted)); United States v. Martin, 790 F.2d 1215, 1218 (5th Cir. 1986) (holding that the defendant had no right to be represented by a non-lawyer); United States v. Wilhelm, 570 F.2d 461, 465 (3d Cir. 1978) (rejecting defendant's contention that he had a constitutional right to be represented by someone who was neither a law school graduate or member of the bar).

defense investigator rendered ineffective assistance was contrary to clearly established federal law. See 28 U.S.C.A. § 2254(d)(1).

Nor can he show that the MAR court's rejection of this claim resulted in a decision that was an unreasonable application of clearly established federal law. See id. Again, there is no U.S. Supreme Court precedent expanding the Sixth Amendment right to effective assistance of counsel to others assisting a criminal defendant. Consequently, the Fourth Circuit Court of Appeals "consistently has 'rejected the notion that there is either a procedural or constitutional rule of ineffective assistance of an expert witness, rather than ineffective assistance of counsel.'" Wilson v. Greene, 155 F.3d 396, 401 (4th Cir. 1998) (quoting Pruett v. Thompson, 996 F.2d 1560, 1573 n.12 (4th Cir. 1993)). In light of the absence of U.S. Supreme Court precedent and the Fourth Circuit's rejection of similar claims, Wallace cannot show that the MAR court's rejection of his claim that his defense investigator rendered ineffective assistance resulted in a decision that involved an unreasonable application of clearly established federal law. See § 2254(d)(1).

Finally, to hold that a defense investigator rendered ineffective assistance under the Sixth Amendment would require this Court to announce a new rule of constitutional criminal procedure on habeas review in violation of Teague v. Lane, 489 U.S. 288 (1989). For the foregoing reasons, this claim is denied.

### B. Ineffective Assistance of Counsel for Failing to Remove Valerie Woodard as Investigator

Wallace next claims that trial counsel rendered ineffective assistance by failing to replace Valerie Woodard as their investigator. Wallace asserts that Woodard had a conflict of interest while working on his case and, therefore, failed to actively investigate leads and interview witnesses who

allegedly would have been helpful to his defense. Specifically, Wallace contends that Woodard failed to make reasonable efforts to interview his ex-girlfriend, Sadie McKnight. Wallace claims that counsel were aware of Woodard's conflicts of interest and deficiencies as an investigator and were ineffective for failing to replace her. The MAR court held an evidentiary hearing on this claim, and denied it on the merits. (MAR Order 18-20).

As evidence that Woodard had a conflict of interest that interfered with her willingness and ability to perform her investigative duties on his behalf, Wallace asserts the following: that Woodard was an investigator employed by the Office of the Public Defender; Woodard was assigned to Wallace's case by his attorney, Isabel Day; Woodard was an integral part of the defense team and the sole investigator for the duration of the case; she worked on all aspects of the case, including locating witnesses, taking statements, determining which witnesses should be called, discussing jury selection and strategy with Wallace's attorneys; she was a member of the local chapter and Vice President of the State chapter of the NAACP; she ran for president of the local chapter of the NAACP while Wallace's case was pending; the NAACP supported an organization known as MOMO (Mothers' of Murdered Offspring), founded by Dee Sumpter, the mother of Shawna Hawk; NAACP and MOMO officers appeared together at news conferences and other events involving Wallace's case; both organizations actively and publicly urged the trial judge to reconsider his decision not to try the nine murder cases together; Kelly Alexander, the State NAACP president, offered Woodard a written contract for the "Story of Serial Killer Henry Louis Wallace as Told by Valerie Woodard" and asked her to provide him with information and defense files about Wallace's case; Woodard told Faye Sultan, one of Wallace's mental health experts, that she was afraid of Wallace; Woodard also told Wallace that she was afraid of him; Woodard had an inappropriate and

unprofessional confrontation with Wallace after learning that he wanted to kill her; Woodard was reprimanded for her conduct; and Woodard provided her brother-in-law, who was incarcerated at the same jail as Wallace, information about the case. Finally, Wallace asserts that Woodard's alleged conflict of interest affected her performance as an investigator. He asserts that she often showed up for work late and fell asleep in court and was reprimanded by trial counsel. Most critically, she failed to arrange an interview with Sadie McKnight, Wallace's ex-girlfriend, for Dr. Sultan, Carmeta Albarus, a forensic social worker, and the trial attorneys. According to Wallace, McKnight knew more about him and his mental condition at the time of the murders than anyone else. Furthermore, a pretrial interview, Wallace asserts, would have enabled his attorneys to impeach McKnight's sentencing testimony. Wallace maintains that had his attorneys been able to impeach McKnight's testimony at trial, the jury would have recommended a life sentence for all nine murders.

Wallace asserts that, as a result of all of the above, he lost all confidence in Woodard and her commitment to his case. He asserts further that he repeatedly asked that she be replaced. Wallace contends that counsel were aware of Woodard's conflict of interest and inadequacies as his investigator. He claims that they rendered ineffective assistance by failing to replace her with another investigator.

In Strickland v. Washington, 466 U.S. 668, 687 (1984), the U.S. Supreme Court articulated a two-pronged test to determine whether "counsel's assistance was so defective as to require reversal of a conviction or death sentence." Wallace first must show that counsel's representation was deficient and must next show that counsel's errors prejudiced the defense so seriously "as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. The standard for assessing counsels' competence under Strickland is whether their "assistance was reasonable considering all the

circumstances." Id. at 688. The test is not whether Wallace's new lawyers, with the benefit of hindsight, would have acted differently, but whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. Because the North Carolina court relied upon Strickland when deciding this claim, this Court's review is limited to whether the state court's application of that case was "objectively unreasonable." Williams, 529 U.S. at 409.

At the hearing conducted by the MAR court, Isabel Day, Jim Cooney, Valerie Woodard, Faye Sultan and Wallace testified about the allegations in this claim. Based upon the testimony of these witnesses, the MAR court made a number of findings of fact. With regard to Woodard's involvement with the NAACP and MOMO, the court found that Woodard and Dee Sumpter, the founder of MOMO, had never met and that Woodard attended joint NAACP and MOMO meetings and events at the direction of trial counsel in order to monitor and report their activities to counsel. (MAR Order 10-11 ¶¶ 9-10). With regard to the proposed contract offered by Kelly Alexander, the court found that Woodard refused to sign the contract, immediately informed Day of the proposed contract, and based upon Woodard's information, Day took immediate steps to secure all information pertaining to Wallace's case and to prevent unauthorized access to it. (Id. at 9 ¶ 3). With regard to conflicts between Wallace and Woodard, the court found that Wallace disliked all of his defense team, including his lead attorney, Isabel Day. (Id. at 11 ¶ 12). The court noted that both Wallace and Woodard denied under oath that they had ever had a dispute during which Woodard yelled at Wallace, and that Woodard had only one "confrontation" with Wallace in the two and one-half years during which she worked on Wallace's case. (Id. at 11 ¶ 14). The court found that Wallace never refused to meet with Woodard. (Id. at 11 ¶ 15). The court also found that there was no evidence that

Woodard discussed Wallace's case with her brother-in-law. (Id. at 17 ¶ 7). Finally, the court found that Wallace had failed to present any evidence that the defense was unable to interview any potential witness because of Woodard. (Id. at 17 ¶ 12). With regard to Woodard's efforts to interview Sadie McKnight, the court found that McKnight did not want to talk to either the defense or prosecution. (Id. at 11 ¶ 17). The court found further that she was difficult to locate and that she had to be coaxed by a police officer to appear at trial for the prosecution. (Id. at 11-12 ¶ 17). Ultimately, the court found that Wallace had failed to present any evidence that his trial was adversely affected by anything Woodard did or did not do. (Id. at 15 ¶ 7).

Findings of fact by a state court are presumed to be correct. See 28 U.S.C.A. § 2254(e)(1). Wallace may overcome that presumption only through the presentation of "clear and convincing evidence" that the state court's factual findings were erroneous. Id. This Court has read the transcript of the MAR evidentiary hearing and finds that Wallace has failed to provide clear and convincing evidence that the MAR court's factual findings were erroneous. Furthermore, this Court finds that Wallace has provided no evidence that Woodard endorsed or supported the actions of Kelly Alexander or the NCAAP with respect to its support for MOMO or its efforts to influence public sentiment or the trial court. The Court finds further that Isabel Day knew of Woodard's involvement with the local NAACP and used that involvement to obtain information about the group's association with MOMO. Furthermore, Day assigned Woodard to the case because she felt it was important to have an African American woman working on the case.[15] (MAR Hr'g Tr. 167).

---

[15] Wallace argues that there was another African American woman in the Public Defender's Office who could have replaced Woodard. However, he overlooks the facts that Woodard was Deputy Chief Investigator on the staff, and that the other African American woman was not promoted to "Investigator" until several months after Wallace's arrest, making her far less experienced than Woodard. (MAR Hr'g Tr. 164, 167, 328-29).

The Court finds further that it was Day who warned Woodard to be alert and cautious around Wallace. (Id. at 323). Additionally, Wallace has failed to show that another defense investigator would have been more successful in obtaining an interview with Sadie McKnight. The defense team was aware that McKnight was not "friendly" to the defense and did not want to talk to them. (Id. at 52-53). Woodard made multiple attempts to contact McKnight but was successful in reaching her only three times. (Id. at 368-69). Police investigators had an equally difficult time locating and talking to McKnight, albeit they were successful in the end. (Id. at 532-39). Finally, the Court finds that even after being told that Wallace wanted to kill her, Woodard carried out the assignments given her by the trial attorneys and that neither attorney observed any indication that Woodard ever failed to follow their instructions or to pursue any information that would have been helpful to Wallace's case. (Id. at 109, 316, 324, 326, 369-70).

Evidence produced at the evidentiary hearing supports the MAR court's conclusion that Wallace failed to show that Woodard's performance as an investigator was hindered or limited by her own interests or by loyalties to anyone other than Wallace. (MAR Order 11-12 ¶ 17). Consequently, the MAR court's rejection of this claim was not based upon an unreasonable determination of the facts in light of the evidence. See 28 U.S.C.A. § 2254(d)(2). Furthermore, Wallace has no constitutional right to an attorney, and by extension an investigator, whom he personally likes and who likes him. See Morris v. Slappy, 461 U.S. 1, 13-14 (1983) (rejecting notion that Sixth Amendment guarantees a criminal defendant the right to a "meaningful relationship" with counsel). Having failed to show that Woodard was operating under divided loyalties or personal animus that interfered with her job as an investigator, Wallace cannot show that counsel rendered constitutionally ineffective assistance for failing to remove her. See Strickland, 466 U.S. at 687

45

(requiring petitioner to show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"). As the MAR court noted, trial counsel cannot be deemed deficient for failing to remove an investigator based upon a conflict of interest that did not exist. For the foregoing reasons, the MAR court's rejection of this claim did not result in a decision that was an unreasonable application of clearly established federal law. See § 2254(d)(1).

### CLAIM IV: Ineffective Assistance of Appellate Counsel

#### A. Failure to Brief an Evidentiary Issue

Wallace asserts that throughout pre-trial motions and the trial, the State admitted that the murder of Sharon Nance, which was not joined for trial with the other nine North Carolina murders, was no more than second-degree murder. (Doc. No. 1: Pet. 87 ¶ 252, 89 ¶259). Wallace argues that this admission was critical to supporting his defense that his other nine murders also were no more than second-degree murder. Wallace contends that because the State was allowed to refer to the facts of the Nance case when cross-examining his mental health experts about their opinions, the trial court should have allowed defense counsel to present evidence that the State had admitted that the Nance murder was no more than second degree murder. He asserts that the State's alleged admissions were admissions of a party opponent under Rule 801(d) of the North Carolina Rules of Evidence and that appellate counsel was ineffective for failing make that argument before the North Carolina Supreme Court on direct appeal.

The right to effective assistance of counsel extends to criminal defendants on their first appeal of right, and the same standards apply to counsel at trial and on appeal. See Evitts v. Lucey, 469 U.S. 387, 396 (1985). In order to prove that he has been denied his Sixth Amendment right to

effective assistance of appellate counsel, Wallace must satisfy the two-prong test set forth in Strickland. 466 U.S. at 688-89. First, Wallace must show that his counsel was objectively unreasonable in failing to identify and argue on direct appeal the alleged trial error. See Smith v. Robbins, 528 U.S. 259, 285 (2000). Second, he must show that but for his attorneys' deficient performance, there is a reasonable probability that he would have prevailed on his appeal. See id. Because the MAR court relied upon Strickland when deciding this claim, this Court's review is limited to whether the court's application of that case was "objectively unreasonable." Williams, 529 U.S. at 409.

The problem for Wallace with regard to this claim is that the North Carolina Supreme Court would not have reviewed on the merits an appellate argument that the State had made an admission of a party opponent with regard to the Nance murder. Consequently, appellate counsel could not have been ineffective for failing to include such an argument in his appellate brief.

North Carolina rules limit appellate review to the assignments of error set out in the record on appeal. See N.C. R. App. P. 10(a). In order to properly make an assignment of error, a defendant must have presented to the trial court "a timely request, objection or motion, stating the specific grounds for the ruling the [defendant] desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(b)(1).

Wallace contends that he both preserved this issue at trial and that appellate counsel assigned it as error on appeal. He contends that appellate counsel's representation was deficient because he failed to then argue the assignment of error in the appellant's brief, thereby waiving it. See N.C. R. App. P. 28(b)(6) (unargued assignments of error in an appellant's brief are considered abandoned). However, the record does not support Wallace's contentions.

47

At trial, defense counsel moved to introduce into evidence a previous statement by the prosecutor that the State was proceeding on the Nance case as a second-degree murder.[16]  (Trial Tr. 550-53, Dec. 16-20, 1996).  The motion was denied.  Near the close of the defense's case, trial counsel renewed his motion, which again was denied. (Id. at 663).  Wallace contends that when trial counsel moved for admission of the transcript excerpt, he was doing so on the grounds that it was an admission of a party opponent. (Doc. No. 1: Pet. 87 ¶ 252).

However, a review of the transcript shows that trial counsel sought to introduce the excerpt as a "judicial admission." (Trial Tr. 550-53, Dec. 16-20, 1996).  A "judicial admission" and an "admission of a party opponent" are distinct legal terms.  A "judicial admission" is

> a formal concession made by a party (usually through counsel) in the course of litigation for the purpose of withdrawing a particular fact from the realm of dispute . . . Such an admission is not evidence but rather removes the admitted fact from the field of evidence by formally conceding its existence.  It is binding in every sense.

Woods v. Smith, 255 S.E.2d 174, 181 (N.C. 1979) (internal quotation marks omitted & emphasis added).  In contrast, an admission of a party opponent is an "evidential admission," defined as "words . . . of a party, . . . admissible in evidence against such party, but which may be rebutted, denied, or explained away and is in no sense conclusive." Id. (internal quotation marks omitted & emphasis added).  Because one is binding on the admitting party, and the other is not, the two terms

---

[16] Trial counsel was referring to the following exchange between the trial court and the prosecutor during a pretrial motions hearing,

|              |                                                              |
|--------------|--------------------------------------------------------------|
| THE COURT:   | Now, there is one case where the State is proceeding on the Second Degree involving Miss Hawk? |
| MS. GOODENOW: | No, Sharon Nance.                                           |

(Mot. Hr'g Tr. 39, April 20, 1995).

cannot be used interchangeably.[17]   Consequently, when trial counsel moved for admission of the

transcript excerpt as a "judicial admission," he could not have been seeking to have it admitted as

an "an admission of a party opponent."[18]   In fact, counsel did not argue or assert in his motion that

the State's alleged representation regarding the Nance murder was an admission of a party opponent

or non-binding admission.  Furthermore, in his renewed motion, counsel did not argue or otherwise

indicate that he was relying on a different legal basis than the one he had offered for his original

motion. (Trial Tr. 633, Dec. 16-20, 1996).  Consequently, Wallace failed to preserve at trial the

question of whether the State's alleged admission was an admission of a party opponent.

Likewise, he failed to assign the issue as error on appeal.  Wallace's appellate counsel

assigned as error the trial court's denial of the motion "to have the court announce as a judicial

admission the status of a second-degree murder . . . ." ®. at 1092, Assignment of Error 69).  When

he used the term "judicial admission," appellate counsel was not referring to both a judicial

admission and an admission of a party opponent, a fact that he acknowledged at the MAR

evidentiary hearing.[19] (MAR Hr'g Tr. 394:15-18).  Therefore, Wallace failed to assign this issue as

error.

Because the issue was not preserved at trial or assigned as error on appeal, appellate counsel

---

[17] Wallace attempts to erase the distinction between the two by calling an admission of a party opponent a "non-binding judicial admission," a term that this Court was unable to find in any North Carolina appellate case.  A "judicial admission" is, by definition, "binding." Woods, 255 S.E.2d at 181.  Therefore, an admission of a party opponent, which is not binding, cannot be a "judicial admission."  To find otherwise would be to recognize a legal absurdity – a non-binding, binding admission.

[18] Benjamin Dowling-Sendor, Wallace's appellate counsel, testified at the MAR hearing that Jim Cooney, who made the motion at trial, called the transcript excerpt a judicial admission when the two discussed issues that should be raised on appeal. (MAR Hr'g Tr. 391).

[19] Dowling-Sendor concluded that the State had not made a judicial admission. (MAR Hr'g Tr. 394). Therefore, he did not argue the issue in Wallace's brief on appeal, thereby waiving the assignment of error. See N.C. R. App. P. 28(b)(6).

did not render ineffective assistance by failing to argue in his appellant brief that the State's alleged admission was an admission of a party opponent. See North Carolina State Bar v. Key, 654 S.E.2d 55, 62 (N.C. Ct. App. 2007) (refusing to consider an argument on an issue that was not assigned as error); State v. Coltrane, 645 S.E.2d 793, 796 (N.C. Ct. App. 2007) (dismissing assignments of error that argued different legal grounds than those raised in defendant's objection at trial).[20] To conclude otherwise would require this Court to find an appellate counsel ineffective for complying with the rules of appellate procedure. Furthermore, even if this issue had been properly preserved, assigned as error and argued on appeal, Wallace cannot show that there is a reasonable probability that the state appellate court would have reversed his convictions and sentence.

The MAR court concluded that even if the trial court had erred, the error was "harmless beyond a reasonable doubt," (MAR Order 28 ¶ 17); Chapman v. California, 386 U.S. 18, 24 (1967). Much of the State's case was built upon Wallace's confessions, which contained overwhelming evidence of premeditation and deliberation. The defense's theory of the case was that Wallace had a mental illness and, therefore, was incapable of forming the specific intent to commit first-degree murder, making the nine murders, at most, second-degree. To support that theory, the defense called Robert Ressler, an expert in the psychology of serial offenders and criminal abnormal psychology, who testified on direct examination that the characteristics of the nine murders and Wallace's behavior demonstrated that Wallace had diminished mental capacity or a mental illness at the time

---

[20] Wallace does not claim that trial counsel was ineffective for failing to preserve this issue. Nor does he claim that appellate counsel was ineffective for failing to assign it as error or as "plain error." N.C. R. App. P. 10(c)(4) (allowing appellant to raise question not preserved at trial provided assignment of error specifically and distinctly alleges plain error).

of the murders.[21] See Wallace, 528 S.E.2d at 352. He testified on cross-examination that in forming his opinion, he had relied upon the facts of the Nance murder and the Bethea murder in South Carolina, as well as the nine murders for which Wallace was standing trial. (Trial Tr. 247, Dec. 16-20, 1996). The State cross-examined Ressler about characteristics of all of the murders, including the Nance and Bethea murders, that tended to show an absence of mental illness according to Ressler's own theories. Wallace, 528 S.E.2d at 352.

Like the MAR court, this Court is not convinced that had the jury known that the State intended to prosecute one of Wallace's ten North Carolina murders as a second-degree murder, the jury would have accepted the defense theory that Wallace could not form the requisite intent to commit first-degree murder in any of the other nine. Unlike his other victims, Sharon Nance was someone unknown to Wallace; she was a prostitute; she and Wallace had consensual sex; the murder took place outside, and Wallace beat her to death with a rock (Trial Tr. 269-71, Dec. 16-20, 1996), all of which made her murder sufficiently dissimilar for the jury to draw a distinction between it and the other nine. Furthermore, during cross-examination and on redirect, Ressler was able to explain why the characteristics of the Nance murder supported his opinion that Wallace was mentally ill notwithstanding the differences between it and the other murders. (Id. at 333-34, 352-53, Dec. 16-20, 1996). Finally, in his taped confessions to police, which the jury heard, Wallace admitted that in at least three cases (Stinson, Mack, and Henderson), he went to the victims' apartments with the intention of murdering them, and that in at least two cases, he brought the murder weapon with him.

---

[21] In his habeas petition, Wallace asserts that the prosecution was permitted to cross-examine his experts about the facts and circumstances of the Nance case. However, on direct appeal, Dowling-Sendor identified only two experts, Ressler and Dr. Ann Burgess, as having been subject to cross-examination on the Nance murder. ®. at 1091, Assignment of Error 65). The Court has read the transcripts of both Ressler and Burgess's testimony and finds that the State cross-examined only Ressler about the Nance murder.

While the jurors accepted that at the time of each of the murders, Wallace was under the influence of a mental or emotional disturbance (R. at 882-83, 895, 922, 935, 948, 960, 974), they simply were not convinced that Wallace had not intentionally killed each victim.

For the foregoing reasons, the MAR court's conclusion that any error by the trial court was harmless beyond a reasonable doubt did not result in a decision that was contrary to or an unreasonable application of clearly established federal law. See 28 U.S.C.A. § 2254(d)(1). Likewise, the MAR court's rejection of Wallace's ineffective assistance of appellate counsel claim also did not result in a decision that was an unreasonable application of clearly established federal law. See id.

### B. Failure to Challenge on Appeal the Trial Court's Excusal of Jurors over 65

Prior to and during jury selection, Wallace moved to prohibit potential jurors over the age of 65 from being excused from jury service at their own request.[22] The trial court denied the motions, and jurors over the age of 65, upon their request, were allowed exemptions prior to trial or were excused during jury selection. Wallace asserts that allowing these jurors to be excused deprived him of a jury drawn from a fair cross-section of the community. He claims that although Dowling-Sendor assigned this issue as error, he was ineffective for failing to argue the issue in the appellate brief, thereby abandoning it on appeal. Wallace raised this claim in his MAR, and the MAR court rejected it on the merits. (MAR Order 32-34).

As discussed in the previous section, in order to show that he was prejudiced by appellate counsel's failure to brief this issue on appeal, Wallace must show that had appellate counsel done so, there is a reasonable probability that the state appellate court would have granted his appeal. See

---

[22] North Carolina law provides that any person summoned as a juror who is 65 years or older may seek an exemption from jury duty on the basis of age. See N.C. Gen. Stat. § 9-6.1 (1996). Whether the exemption is granted is discretionary. See id.

Smith v. Robbins, 528 U.S. at 285. Wallace concedes, as he must, that the state appellate court would not have granted his appeal had Dowling-Sendor briefed this claim. See State v. Rogers, 562 S.E.2d 859, 877 (N.C. 2002) (holding that allowing jurors over the age of 65 to exempt themselves from jury service does not violate a criminal defendant's Sixth Amendment right to a jury drawn from a fair cross-section of the community). Because Wallace would not have been successful on direct appeal had appellate counsel argued this issue, the MAR court concluded that appellate counsel did not render constitutionally ineffective assistance by abandoning the assignment of error.

Nevertheless, Wallace continues to press this claim, arguing that he was prejudiced not because he would have been successful on appeal but because appellate counsel failed to preserve the fair cross-section claim for federal habeas review. Therefore, Wallace argues, he will not have the benefit of any future U.S. Supreme Court ruling that exclusion of jurors over 65 is unconstitutional. Wallace contends that, as a remedy, this Court should issue an Order preserving the fair-cross section claim for future habeas review.

Wallace has presented no U.S. Supreme Court or federal appellate case law holding that the prejudice prong of Strickland does not apply in cases where appellate counsel failed to preserve an issue in perpetuity. Cf. Kornahrens v. Evatt, 66 F.3d 1350, 1360 (4th Cir. 1995) (deciding that attorney's assistance was not rendered ineffective because he failed to anticipate a new rule of law); Randolph v. Delo, 952 F.2d 243, 246 (8th Cir. 1991) (ruling that trial counsel was not ineffective for failing to raise Batson challenge two days before Batson was decided); Honeycutt v. Mahoney, 698 F.2d 213, 216-17 (4th Cir. 1983) (deciding that trial counsel was not ineffective for failing to object to subsequently-overruled, but then long-standing, North Carolina law). Likewise, he has presented no case law or statutory authority granting a federal habeas court the power to order that

a claim not raised by the petitioner on federal habeas review nonetheless be preserved for federal habeas review on the outside chance that the U.S. Supreme Court might take up the issue at some point in the future. Therefore, this Court will continue to comply with the requirements of § 2254(d) and analyze whether the MAR court's application of Strickland to this claim was "objectively unreasonable." Williams, 529 U.S. at 409.

Although not explicit in the text, the Sixth Amendment requires that a defendant's jury be drawn from a venire representing a "fair cross section of the community." Holland v. Illinois, 493 U.S. 474, 480 (1990) (internal quotation marks omitted). In order to establish a prima facie case for a violation of the Sixth Amendment right to a jury venire that represents a "fair cross-section" of the community, a defendant must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Duren v. Missouri, 439 U.S. 357, 364 (1979). Wallace has failed to provide sufficient evidence to meet any of these three criteria and, therefore, has failed to establish a prima facie case for a violation of the Sixth Amendment.

As an initial matter, Wallace has failed to show that people over the age of 65 are a "'distinctive group' in the community." Id. The U.S. Supreme Court has yet to recognize a group as "distinctive" for fair cross-section purposes based solely upon the age of the members of the group. Furthermore, Wallace has failed to identify any federal appellate court that has recognized distinctiveness based solely upon age. In fact, the weight of authority points to the opposite

conclusion.[23]  Wallace has provided no evidence or argument that would persuade this Court to ignore the aforementioned authority and recognize that a group is distinctive simply because all of its members are over 65 years old.

Even assuming that those over 65 are a "'distinctive' group in the community," Wallace has failed to provide any evidence that the representation of those over age 65 in jury venires in Mecklenburg County, North Carolina "is not fair and reasonable in relation to their numbers in the community." Duren, 439 U.S. at 364.  Finally, assuming that those over 65 are under-represented in jury venires in Mecklenburg County, Wallace has failed to provide any evidence that the under-representation was the result of systematic exclusion, which requires some form of affirmative discrimination. See United States v. Cecil, 836 F.2d 1431, 1448 (4th Cir. 1988) (holding that when voter registration lists are used to draw jury venires, "there is no violation of the jury cross-section requirement where there is merely underrepresentation of a cognizable class by reason of failure to register, when that right is fully open").  In this case, the right of those over 65 to participate in the jury selection process was "fully open" had they chosen not to opt-out.

Appellate counsel was not ineffective for failing to argue a meritless claim.  Therefore, the MAR court's rejection of this claim did not result in a decision that was an unreasonable application of clearly established federal law. See 28 U.S.C.A. § 2254(d)(1).

---

[23] See, e.g., Brewer v. Nix, 963 F.2d 1111, 1113 (8th Cir. 1992) (rejecting those over age 65 years as distinctive group); Silagy v. Peters, 905 F.2d 986, 1009-11 (7th Cir. 1990) (rejecting age 70 and over as distinctive group); see also Wysinger v. Davis, 886 F.2d 295, 296 (11th Cir. 1989) (rejecting age alone as determinative of distinctiveness for Sixth Amendment purposes); Ford v. Seabold, 841 F.2d 677, 682 (6th Cir. 1988) (rejecting "young adults" as distinctive group); Barber v. Ponte, 772 F.2d 982, 998-99 (1st Cir. 1985) (en banc) (rejecting 18-34 years as distinctive group); United States v. Test, 550 F.2d 577, 591 (10th Cir. 1976) (rejecting 21-39 years as distinctive group); United States v. Diggs, 522 F.2d 1310, 1317 (D.C. Cir. 1975) (rejecting 21-30 years as distinctive group); United States v. Kuhn, 441 F.2d 179, 181 (5th Cir. 1971) (rejecting 21-23 years as distinctive group).

### CLAIM V:  **Brady** and **Napue** Claims

     A.  *Napue Claim*

Wallace claims that the State knowingly presented false and misleading testimony at the sentencing hearing through Sadie McKnight and that he, therefore, is entitled to a new sentencing hearing.  He raised this claim in his MAR, and the MAR court rejected it on the merits. (MAR Order 52-55).

In Napue v. Illinois, 360 U.S. 264, 269 (1959), the U.S. Supreme Court held that under the due process clause of the Fourteenth Amendment, a State may not knowingly use false evidence to obtain a conviction.  This applies equally to situations where the State deliberately elicits false testimony and where the State, although not soliciting false evidence, allows it to go uncorrected. Id.  The rule does not "cease to apply merely because the false testimony goes only to the credibility of the witness," rather than directly to the culpability of the defendant. Id.  However, Napue and its progeny do not automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the [outcome] . . . ." Giglio v. United States, 405 U.S. 150, 154 (1972) (internal quotation marks omitted).  Instead, a new trial is warranted if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." Napue, 360 U.S. at 271.

At sentencing, the State called only one witness, Sadie McKnight, who testified in rebuttal to the defense's mitigating evidence.  McKnight was Wallace's former girlfriend and had lived with him for two years prior to his arrest.  This time period coincided with most of Wallace's murders.  However, about a month before his arrest, she ended the relationship upon learning that Wallace was using crack cocaine.  It was during that month that Wallace murdered his last four victims.

According to Wallace, McKnight gave the following false or misleading testimony on direct examination: that she had visited Wallace's family and that everything seemed normal; that Wallace had no scars on his body from anything other than working with hot grease in fast food restaurants; that she observed no unusual behavior on Wallace's part during her relationship with him; that Wallace's drug use was minimal, involving only marijuana, and that she only became aware of Wallace's crack cocaine use a week before his arrest.[24] (Doc. No. 1: Pet. 101 ¶¶ 295-96). Wallace also asserts that McKnight gave false and misleading testimony on cross-examination when she asserted that Wallace did not possess any positive characteristics. (Id. at 101 ¶ 297). Wallace claims that prosecutors knew that McKnight's statements were false but did nothing to correct them.

After an evidentiary hearing on this issue, the MAR court concluded that the State did not knowingly present false testimony through McKnight. As evidence that the MAR court's conclusion was unreasonable, Wallace points to a set of notes taken by one of the prosecutors during an interview with McKnight on the day of her testimony.[25] (MAR Ex. G). Those notes indicate that McKnight was unaware that Wallace was using cocaine until near the end of their relationship; that she began to suspect that Wallace was using cocaine after he began stealing money from her; that she told police where to find Wallace after he paged her on the day of his arrest; that she went with police to the location where Wallace was arrested; that Wallace looked dirty and "out there;" that she had never seen him looking that bad; that the Wallace she knew was "decent, clean;" that

---

[24] On cross-examination, McKnight indicated that she had misspoken on direct examination when she testified that she had only become aware of Wallace's cocaine use about a week before his arrest. (Trial Tr. 2978-79, Nov. 11-26, 1996 & Jan. 6-17, 1997). On cross, she testified that it was about a month before Wallace's arrest that she discovered that he was using cocaine and ended the relationship. (Id. at 2978-79). This testimony is corroborated by other evidence in the record that the relationship ended about a month prior to Wallace's arrest. (Doc. No. 1: Def. MAR Hr'g Ex. 29 at 1, 19).

[25] These notes were not disclosed to the defense until post-conviction.

57

Wallace had acted shocked when he heard of Audrey Spain's murder; that Wallace was arrested for stealing from a department store; that she called "Rock," (Investigator Richard K. Harris) a mutual friend at CMPD, and told him that Wallace "was changing;"[26] that Wallace took her to meet his family in November 1993; that the family seemed very "close knit;" that Wallace did housework for his mother while they were there; that she and Wallace did not sleep in the same bed out of respect for his mother; that Wallace showed great respect to his mother; and that she knew nothing about any beatings or abuse by Wallace's mother. (Id.)  None of the aforementioned assertions conflict with McKnight's testimony or otherwise indicate that she testified falsely.

Wallace's primary complaint concerns McKnight's testimony on cross-examination.  Defense counsel asked McKnight whether, during pre-trial interviews, she was "asked any questions [by the District Attorney] about any of the good things about Henry Wallace that you know?"[27] (Trial Tr. 2972, Nov. 11-26, 1996 & Jan. 6-17, 1997).  McKnight responded, "[t]here's no good things about him. . . .  I'm sorry.  To answer your question, no." (Id. at 2972).  Again, Wallace cannot show that McKnight testified falsely.  There is no evidence that the prosecutor asked McKnight any questions about Wallace's positive characteristics.  As for McKnight's statement that "there's no good things about him," Wallace points to four words that appear in the interview notes – trustworthy, polite, nice guy (MAR Ex. G) – and argues that these were words that McKnight used to describe him to

---

[26] According to Wallace, the notes state that just prior to his arrest, McKnight was so concerned about the mental changes in Wallace that she called Investigator Harris. (Doc. No. 1: Pet. 102 ¶301).  However, there is nothing in the notes to support Wallace's characterization of either the timing of McKnight's call to Investigator Harris or the nature of her concern. (MAR Ex. G).

[27] In his habeas petition, Wallace misstates this question, asserting that McKnight was asked whether she had informed the State about any of the good things that she knew about him. (Doc. No. 1: Pet. 101 ¶297).  A review of the transcript reveals that the question asked was whether prosecutors had asked her any questions about any of the good things that she knew about Wallace. (Trial Tr. 2972, Nov. 11-26, 1996 & Jan. 6-17, 1997).

the prosecutor.  On the contrary, McKnight testified that Wallace had deceived her into thinking that he was someone she could love and trust but that the truth was far different. (Trial Tr. 2973).  There is no evidence that she said anything different during her interview with prosecutors.  Indeed, Investigator Harris, who was present during the interview, testified at the MAR hearing that McKnight did not say anything positive about Wallace during the interview. (MAR Hr'g Tr. 525-26).

Based upon the foregoing, the MAR court's conclusion that the State did not present, or let go uncorrected, false evidence through McKnight was not an unreasonable determination of the facts in light of the evidence. See 28 U.S.C.A. § 2254 (d)(2).  Likewise, the MAR court's conclusion did not result in a decision that was contrary to or an unreasonable application of clearly established federal law. See § 2254(d)(1).

B. *Brady* Claim

Wallace claims that the State suppressed a number of documents that contained either exculpatory or impeaching evidence and that would have been "helpful" to the defense during the suppression hearing, at trial and at sentencing.  The MAR court held a hearing on this claim and denied it on the merits. (MAR Order 43-45, 47-49).

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that the prosecution deprives a criminal defendant of due process when it suppresses evidence that is "favorable to an accused . . . where the evidence is material either to guilt or to punishment . . . ." There are three elements that Wallace must establish in order to prove a Brady violation:  (1) the evidence must be favorable, "either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and (3) the evidence must be material, i.e., "prejudice must have ensued." Strickler v. Greene, 527 U.S. 263,

281-82 (1999). In order to establish the "prejudice" component, Wallace must show that "there [was] a reasonable probability" that the result of the trial would have been different if the suppressed evidence had been disclosed to the defense. Id. at 281. In other words, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995). Because the MAR court correctly identified the governing legal standard as that set forth in Brady, this Court's review is limited to whether that court's application of Brady was "objectively unreasonable." Williams, 529 U.S. at 409.

*Anita Ramirez, Denise Chestnut, Woodrow "Larry" Spencer, Stephen Ernsberger*

Shortly after Wallace's arrest, police took statements from several of his friends and acquaintances, among them Anita Ramirez, Larry Spencer, Stephen Ernsberger and Denise Chestnut. Copies of all of these statements, except Denise Chestnut's,[28] were given to the defense prior to the suppression hearing. (Doc. No. 1: Def. MAR Hr'g Exs. 22, 25, 20).[29] However, shortly before the suppression hearing, police investigators reinterviewed the aforementioned. The defense was not provided copies of any of those interviews.

Wallace asserts that the undisclosed, follow-up interviews contain exculpatory information about his substance abuse and mental state prior to his arrest. For example, Denise Chestnut told investigators that she knew that Wallace used crack cocaine, but that she had never been around him when he was high; that when he drank, he was always in control; and that Wallace truly seemed

---

[28] Wallace does not assert a Brady violation with respect to this statement.

[29] The Court is citing to Defendant's MAR hearing exhibits depicted in handwriting on the face of the documents that are attached to the Defendant's Petition for Writ of Habeas Corpus (Doc. No. 1).

depressed over the death of one of his victims. (Id. Ex. 24). Anita Ramirez told investigators that she knew that Wallace had been drinking a lot since he was evicted from his apartment; that during that time he was dirty and unwashed; that he was not sleeping much; that she was unaware of any drug problem that Wallace may have had; that on the Saturday prior to his arrest, she knew by looking at Wallace that there was something wrong with him; that he was crying while on the phone at her house. (Id. Ex. 23). Larry Spencer told police that Wallace was "bad off" the last four days before his arrest; that Wallace had not been eating; that he had not been bathing and was out walking in the mornings and late at night; that he knew that Wallace was using cocaine, but he could not tell when Wallace was high. (Id. Ex. 27). Stephen Ernsberger told police that the last time he saw Wallace, Wallace appeared to be paranoid. (Id. Ex. 21). Wallace argues that the information in these interviews would have helped persuade the judge to suppress his statements, convince the jury to find him "not guilty" of first-degree murder, and compel the jury to sentence him to life in prison rather than to death.

Wallace cannot succeed on this claim for several reasons. Brady does not apply "if the evidence in question is available to the defendant from other sources," United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990) (internal quotation marks omitted), either directly or via investigation by a reasonable defendant, see Barnes v. Thompson, 58 F.3d 971, 975 n.4 (4th Cir. 1995). Ramirez, Spencer, and Ernsberger were known by the defense to be friends or acquaintances of Wallace. The statements that were provided to the defense indicated that each had seen Wallace in the days before his arrest. At least one member of the defense team interviewed Spencer and Ernsberger prior to the suppression hearing. The defense interviewed Chestnut prior to trial, but chose not to interview Ramirez. The fact that the State did not turn over the follow-up statements does not mean that it

suppressed evidence that was not otherwise available to the defense through reasonable investigation of its own. See Wilson, 901 F.2d at 380. Brady imposes no requirement on the State to conduct a defendant's investigation for him.

Furthermore, as the MAR court noted, there was nothing of substance in the undisclosed interviews that the defense did not already know through discovery and its own investigation.[30] Jim Cooney acknowledged this fact under cross-examination at the MAR hearing. (MAR Hr'g Tr. 64-96). With respect to the suppression hearing, none of these witnesses saw Wallace at the time of his arrest and would have been unable to testify about his condition. Notwithstanding that fact, a number of police officers who testified at the hearing described Wallace as dirty, unkempt, and noticeably unwashed. Evidence was elicited that Wallace recently had been evicted from his apartment but was sneaking back in through a broken window late at night to sleep there. Additionally, investigators who interviewed him testified about Wallace's admission to a problem with cocaine. Finally, Dr. Faye Sultan, a clinical psychologist who testified for the defense at the suppression hearing, was able to report Spencer's observation that Wallace was able to mask most of the effects of cocaine such that Spencer was unable to tell whether or not Wallace was high. (Suppression Hr'g Tr. 1355, Mar. 27, 1995).

With respect to the guilt/innocence and sentencing proceedings, the information in the undisclosed documents merely corroborates the testimony of experts, civilian witnesses, and police officers who testified at those proceedings. Consequently, Wallace cannot meet the second prong of the Brady test – that the State suppressed evidence when it failed to disclose the follow-up

---

[30] Even Steven Ernsberger's report that Wallace was acting "paranoid" was not new to the defense. In his original interview, Ernsberger stated that the last time he had seen Wallace, Wallace was acting weird and had stated that he thought someone was following him. (Doc. No. 1: Def. MAR Hr'g Ex. 20).

interviews of Ramirez, Chestnut, Spencer and Ernsberger. See Strickler, 527 U.S. at 281-82.

*Sadie McKnight*

Wallace contends that the State's notes of its interview with Sadie McKnight contain exculpatory evidence that supported the defense theory that he was in a downward mental spiral in the period leading up to his arrest. Specifically, Wallace points to McKnight's report that she had contacted Investigator Harris to report that Wallace "was changing," and that when she saw him at the time of his arrest it was the first time that she had seen him "looking this bad" and that he looked "out there." Wallace asserts further that the notes contain McKnight's description of some of his good qualities – decent, clean, trustworthy, polite and nice – that would have allowed him to impeach McKnight's testimony that there was nothing good about him. Because the interview took place on the day that McKnight testified at the sentencing proceeding, the notes are relevant only to that proceeding.

As an initial matter, Wallace's characterization of the evidence in the notes is not supported by the notes themselves. For example, McKnight's reference to her contact with Investigator Harris appears immediately after a notation referring to Wallace's larceny at Belk. (Doc. No. 1: Def. MAR Hr'g Ex. 31 at 4). There are several references in the notes to McKnight's discovery that Wallace was stealing from her and others and to her suspicions that he was using crack cocaine. (Id. Exs. 31 at 3, 4, 6). There is nothing in the notes to indicate that McKnight was becoming concerned about Wallace's mental health. As for her impressions of his appearance at the time of his arrest, there is nothing to suggest that she was referring to anything other than his physical appearance, which evidence previously submitted to the jury showed Wallace to be dirty, unwashed and unkempt. (Trial

Tr. 1366-69, 1389, 1395, Nov. 11-26, 1996 & Jan. 6-17, 1997).[31] That she was referring to his physical appearance is supported by the following notation that the Henry she knew was "decent, clean." (Doc. No. 1: Def. MAR Hr'g Ex. 31 at 3). As for the descriptive words "trustworthy, polite and nice," there is no evidence that McKnight was describing Wallace's qualities as opposed to what she had thought his qualities were prior to learning that she had been living with a serial killer. (Trial Tr. 2973).

Wallace puts forth the argument that he could have used these notes to impeach her testimony, specifically her testimony that she did not notice anything unusual about Wallace while they were dating and her testimony on cross-examination that there was nothing good about him. It is not clear to the Court how Wallace could have impeached either portion of testimony and benefitted from it. When McKnight testified that she had not noticed anything unusual about Wallace, it was in response to a series of questions that began with whether she had any knowledge of him having hallucinations during the two years that they were together. (Trial Tr. 2967, Nov. 11-26, 1996 & Jan. 6-17, 1997). In response to whether she personally had observed anything unusual about Wallace, McKnight testified that she had not observed anything "[t]o indicate that he might be a little off." (Id. at 2968). The only "unusual" behavior mentioned in the prosecutor's interview notes was the fact that Wallace had begun stealing from her and others and that she had discovered that he was using cocaine. (Doc. No. 1: Def. MAR Hr'g Exs. 31 at 3, 4, 6, 8). There was evidence before the jury that McKnight ended her relationship with Wallace because he was using cocaine. (Trial Tr. 2978-79).

_____

[31] Wallace attempts to connect his appearance at the time of his arrest to his supposed deteriorating mental health. However, he overlooks the fact that he had been evicted from his apartment several days before his arrest, leaving him essentially homeless during that time. (Trial Tr. 1392, Nov. 11-26, 1996 & Jan. 6-17, 1997).

As for the supposed positive characteristics listed in the notes, the sentencing transcript reflects that the defense deliberately declined to offer any character evidence during its mitigation case. (Id. at 2955). In fact, defense counsel objected to McKnight's testimony because they believed that the State was calling her to elicit evidence of Wallace's bad character. (Id. at 2955-57). However, the State did not elicit any character evidence on direct examination of McKnight. When defense counsel asked on cross-examination whether prosecutors had asked her any questions prior to trial about Wallace's positive characteristics, McKnight unleashed a bitter response. (Id. at 2972). Counsel attempted to impeach McKnight by asking her several questions designed to show that because she had stayed with him for two years, McKnight must have believed that Wallace had some good qualities. (Id. at 2972-73). McKnight explained that when they were together she had thought that Wallace had good qualities but that he had been deceiving her. (Id. at 2973). Defense counsel was able to get McKnight to admit that she had loved Wallace. (Id. at 2974).

Wallace's argument that he would have faired better had defense counsel possessed the prosecutor's notes simply is not convincing. To have impeached McKnight with her supposed observations that Wallace was "trustworthy, polite and a nice guy" would have opened the door for the State on re-direct to elicit relevant damaging evidence also contained in the notes. In particular, the State could have asked McKnight if she also had told prosecutors that Wallace "had treated her nice for the most part until the end . . . [when] he tried to choke her." (Doc. No. 1: Def. MAR Hr'g Ex. 31 at 8). That would have served as a reminder to the jury that Wallace had choked all of his victims.

*Dr. Edward Landis*

Shortly after Wallace was arrested, the lead prosecutor, Marsha Goodenow, contacted a

family friend, Dr. Edward Landis, a forensic psychologist, and asked for his help in identifying possible mental health defenses that could arise at trial. (MAR Hr'g Tr. 492-93). Goodenow provided Dr. Landis with transcripts of Wallace's confessions. (Id. at 490). In July 1994, Dr. Landis sent Goodenow a letter in which he discussed possible issues that could be raised by the defense and advised her of ways that the State could respond. (Doc. No. 1: Def. MAR Hr'g Ex. 32). The letter was not disclosed to the defense. Dr. Landis did not interview Wallace or perform an evaluation of him. He was not retained by the State; he received no compensation for his letter and advice, and he was not called as a witness by the State. (MAR Hr'g Tr. 491). Wallace argues that the letter corroborated his mitigation defense that he suffered from mental illness, and that had the defense possessed the letter, the State would not have been able to argue to the jury that he was not mentally ill.

The MAR court found as a matter of fact that Dr. Landis's letter was not exculpatory evidence under Brady. (MAR Order 55-58). As noted previously, a finding of fact by a state court is presumed to be correct, and Wallace bears the burden of rebutting that presumption "by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1). The only evidence that Wallace offers to rebut the State court's finding of fact is that Dr. Landis allegedly diagnosed Wallace with Cocaine Dependence, Cannabis Abuse and Possible Dissociative Disorder Not Otherwise Specified ( "NOS") and had referred to Wallace as an "incredibly disturbed individual."

As an initial matter, notwithstanding what he called them in his letter, Dr. Landis did not diagnose Wallace with any mental illness, disorder or dependency. (MAR Hr'g Tr. 494). Dr. Landis testified at the MAR hearing that it would have been unethical for him to have made an official diagnosis without first having conducted an evaluation of Wallace. (Id. at 509). The "diagnoses"

referred to in his letter were meant as educated guesses, based upon Wallace's self-reporting in the transcripts, as to the types of diagnostic issues that might arise during the case. (Id. at 494, 509).

Dr. Landis was remarkably accurate in his predictions. He predicted that Sexual Sadism, Cocaine Dependence, Cannabis Abuse, Possible Dissociative Disorder NOS, and Anti-Social Personality Disorder might arise as diagnostic issues. Dr. Faye Sultan, who had conducted an extensive evaluation of Wallace over the course of multiple interviews, totaling 50 hours, and who had relied upon numerous intelligence, psychological, personality, neuropsychological, and medical tests, school records, military service records, prison conduct records, prison mental health records, and a forensic social worker's social and developmental history, testified at sentencing that she had diagnosed Wallace with Depersonalization Disorder, Depressive Disorder NOS, Cocaine Dependance, Paraphilia NOS, and Personality Disorder NOS. Wallace has cherry-picked some diagnostic terms and concepts that appear in both Dr. Landis's letter and Dr. Sultan's diagnoses and argues that the former supports the latter's diagnoses of mental illness. However, a review of both Dr. Landis's letter and Dr. Sultan's testimony shows that there is little, if any agreement between them.

Dr. Sultan's primary diagnosis was that Wallace had a severe personality disorder (Trial Tr. 2743-44, Nov. 11-26, 1996 & Jan. 6-17, 1997) that she designated as "not otherwise specified" because he had features of a number of different personality disorders, including paranoid personality disorder, schizotypal personality disorder, antisocial personality disorder, borderline personality disorder, narcissistic personality disorder, dependent personality disorder, and obsessive compulsive personality disorder (Id. at 2745-48). According to Dr. Sultan, Wallace's personality disorder is a mental illness. (Id. at 2737-38, 2745-48). Dr. Landis's educated guess was that a personality

disorder, in particular Anti-Social Personality Disorder, would arise as a primary diagnosis for Wallace. (Doc. No. 1: Def. MAR Hr'g Ex. 32 at 2). However, Dr. Landis's letter indicates that he did not view the personality disorder as a mental illness. (Id.). He described Anti-Social Personality Disorder as an "enduring pattern of maladaptive behavior characterized by rejection of and opposition to social norms. . . . rather than acute mental illness." (Id.). Dr. Landis also stated that Wallace's "predilection for violating rules and literally violating others" was not attributable to mental illness but to his character. (Id. at 3 ¶ 4).

Dr. Sultan also testified that Wallace's cocaine dependence was a mental illness. (Trial Tr. 2740). The Court can find no support for this idea in Dr. Landis's letter. Dr. Landis predicted that Wallace's drug problems would be a diagnostic issue with his cocaine use being more significant than the marijuana. (Doc. No. 1: Def. MAR Hr'g Ex. 32 at 2). It also was Dr. Landis's educated guess that Wallace's drug use merely was a way in which Wallace was antisocial. (Id. at 3).

Dr. Sultan diagnosed Wallace with Paraphilia NOS, which she described as sexual deviations or perversions. (Trial Tr. 2742). She testified that Wallace's paraphilia was a mental illness. (Id. at 2737-38, 2742). Dr. Landis predicted that sexual sadism might arise as a diagnostic issue,[32] but his educated guess was that Wallace's sexual violence, like his drug use, was a reflection of his personality disorder not a mental illness. (Doc No. 1: Def. MAR Hr'g Ex. 32 at 3). Dr. Landis also warned that a defense expert might advance the idea that paraphilia "involves a significant degree of impairment in behavioral control." (Id. at 1).

Dr. Sultan also diagnosed Wallace with Depersonalization Disorder, which she characterized

---

[32] Dr. Sultan testified that sexual sadism is a form of paraphilia. (Trial Tr. 2853, Nov. 11-26, 1996 & Jan. 6-17, 1997).

as a sense of estrangement or detachment from oneself. (Trial Tr. 2737). She testified that

Depersonalization Disorder is a mental illness. (Id. at 2737-38). Dr. Landis made an educated guess

that if Wallace's self-reports about "'it being like someone else was doing it'" were "given a lot of

credence," it was possible that an expert might diagnose Wallace with Dissociative Disorder NOS.[33]

(Doc. No. 1: Def. MAR Hr'g Ex. 32 at 2-3). However, Dr. Landis expressed his own skepticism of

such an official diagnosis, calling it "merely a possibility," and stating that,

> my argument would be that anytime one is involved in a uniquely emotionally
> charged situation, whether it is strangling and murdering someone or giving a speech
> to 1,000 people, one's sense of self-perception is altered. This is even more the case
> in that [Wallace] was stoned during several of the later crimes.

(Id.).

Finally, the Court turns to Wallace's argument that had the jury known that Dr. Landis had

written that Wallace "is an incredibl[y] disturbed individual," the State would not have been able to

argue that Wallace was not mentally ill. (Doc No. 1:Pet. 110 ¶ 332). Not only has Wallace taken that

comment out of context, he has left out its qualifying second half. Dr. Landis's comment came in

a section of the letter in which he offered the State advice about how to counter the jury's natural

inclination to believe that there must be something wrong with anyone who could do the kinds of

things that Wallace had confessed to doing. (Doc. No. 1: Def. MAR Hr'g Ex. 32 at 3 ¶ 3).

According to Dr. Landis, it was the State's job to help the jury see that Wallace "is an incredibly

disturbed individual, but not because he has a mental illness. Rather its because that's who and what

he is." (Id. (emphasis added)). To illustrate what he meant, Dr. Landis noted that a personality

disorder is a description of character and that Wallace's "predilection for violating rules and literally

---

[33] Depersonalization Disorder is classified as a Dissociative Disorder. See American Psychiatric
Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000).

violating others" was not attributable to mental illness but to his character. (Id. at 3 ¶ 4). In other words, Dr. Landis wrote, "[t]here is no good Henry Wallace who didn't do these [kinds of] things until he became [mentally ill.]" (Id.).

When read in context, Dr. Landis's letter is not exculpatory. As such, Wallace has failed to provide clear and convincing evidence that the MAR court erred in finding that the letter was not exculpatory. Therefore, he cannot meet the first element under Brady.

Ultimately, Wallace also cannot show that he was prejudiced by the State's decision not to disclose the McKnight interview notes and Dr. Landis's letter. At the sentencing proceeding, defense counsel presented a forensic social worker who testified from a psychosocial history that she had developed based upon extensive interviews with Wallace, his mother, sister, uncle, fiancé, estranged wife, ex-girlfriends, childhood friends, neighbors, teachers, employers, and coworkers. Defense counsel presented the testimony of six other witnesses who knew Wallace when he was growing up. Between them, the social worker and other witnesses testified that Wallace grew up in extreme poverty; that his father not only rejected him but would have nothing to do with him or his mother after Wallace was born; that Wallace was raised by a mother who had been orphaned as a teenager, that his mother physically and emotionally abused Wallace; that Wallace was exposed to numerous instances of sexual violence and violence against women at a very young age; that Wallace himself was a victim of sexual abuse at a very young age; that Wallace was taught that sexual violence against women was acceptable; that Wallace performed well in the structured environment of the Navy; and that Wallace began a downward mental spiral after the break-up of his marriage. Dr. Sultan testified that while Wallace suffered from five identifiable mental illnesses, he was so mentally ill in so many different ways that there was no way to adequately diagnose him under the

70

standard diagnostic manual used in her field. As a result of the defense mitigation evidence, the jury found the following to be mitigating in all nine murders: that Wallace was under the influence of a mental or emotional disturbance at the time of each crime; that while young, Wallace was an object of ridicule in his family and neighborhood; that while young, Wallace was molested by older girls in his neighborhood; that Wallace was exposed to sexual violence from an early age; that Wallace was raised in an emotionally abusive environment; that Wallace began exhibiting psychological and emotional problems in his early teenage years; that following his discharge from active duty and separation from his wife, Wallace began to experience increasing mental, emotional and psychological problems; that from January 1989 until his arrest on March 12, 1994, Wallace's life was a downward spiral of increasing psychological, mental, and emotional problems, drug use, marginal employment and unemployment; and that Wallace indicated during his confessions that he was confessing because he knew he needed to be stopped and could not stop himself. Nevertheless, in each case the jury recommended a sentence of death.

There is nothing in the McKnight notes or Dr. Landis's letter that "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435. Therefore, the MAR court's rejection of Wallace's Brady claim did not result in a decision that was an unreasonable application of clearly established Federal law. See 28 U.S.C.A. § 2254(d)(1).

For the foregoing reasons, its is **HEREBY ORDERED THAT**:

1. Petitioner's Petition for Writ of Habeas Corpus (Doc. No. 1) be **DENIED;**

2. Respondent's Motion for Summary Judgment (Doc. No. 15) be **GRANTED**, and

3. Petitioner's Motion for Summary Judgment (Doc. No. 14) be **DENIED**.

Signed: May 5, 2008

Robert J. Conrad, Jr.
Chief United States District Judge